[S. F. No. 5477.   In Bank.—September 2, 1910.]

CITY STREET IMPROVEMENT COMPANY, Plaintiff, Petitioner, v. JAMES H. KROH, Defendant, Respondent.

IMPROVEMENT OF HIGHWAY—CONSTRUCTION OF "GOOD ROADS LAW"— DISCREPANCIES BETWEEN PRELIMINARY REPORT AND FINAL SPECIFICATION—CONTRACT VALID.—Under the "Good Roads Law" of 1907, it was not intended that the preliminary report of the highway commissioners to the supervisors should go into detail, or that a slight or reasonable departure therefrom in the final specifications for the doing of the work not destructive of the general plan proposed, should render the contract void.

ID.—PURPOSE OF PRELIMINARY REPORT—ELECTION—BONDS—GENERAL PLAN—DEPARTURE.—The main purpose of the preliminary report is served when the election is called and held. If the bonds are authorized, and the money obtained thereon, it may be expended for the improvement of the roads mentioned in the report, the general plan of which must be adhered to. It would require a radical departure therefrom to invalidate a contract thereafter made in good faith.

ID.—MERE VARIATION IN DETAILS OF IMPROVEMENT—ASPHALTIC MACADAM.—No mere variation in the details of the same kind of im-

provement between the preliminary report and the final specifications will invalidate the contract. Where the preliminary report stated that where asphaltic macadam was made, it should be composed of a mixture of the best grade of hard tough crushed stone and best asphalt, and other materials, and the final specifications allowed either gravel or crushed rock to be used at the option of the contractor, subject to requirements as to quality and to the approval of the engineer of the commissioners, there is a mere variation in the details of the same kind of improvement, not vitiating the contract.

ID.—LETTING OF CONTRACTS FOR PUBLIC WORK—CERTAINTY ESSENTIAL.—It is a general principle of law applying to the letting of contracts for public work to the lowest bidder, upon plans and specifications previously adopted, that they must be sufficiently certain and definite upon all of the details of the work which affect its cost to apprise bidders of all the essential and substantial parts of the work and enable them to know with reasonable accuracy the outlay they will have to make in performing the work to be contracted for.

ID.—REASONS OF RULE REQUIRING CERTAINTY IN SPECIFICATIONS—UNCERTAINTY AFFECTING RIGHTS INVOLVED.—The reason of the rule requiring certainty in the specifications of a public improvement in the contract to be let therefor is, in part, because uncertainty therein deprives property-owners of the knowledge necessary to undertake the work for themselves, as the statute provides they may; and, in part, because it deprives bidders of like knowledge and thereby tends to prevent the fair competition and resulting low cost of work, which is the principal object of the rule.

ID.—SUFFICIENT SUPPORT OF RULE—APPLICABILITY—TAXES—BONDS—ASSESSMENT.—The latter reason for the rule is as persuasive as the first, and is sufficient to support the rule. The rule applies as well where the cost is to be paid with money already raised by taxation, or by the sale of bonds, as where it is to be raised after the work is done by assessment upon the benefited property.

ID.—EXCEPTION TO RULE—DETAILS NOT ASCERTAINABLE IN ADVANCE—UNFORESEEN CONTINGENCY.—There is an exception to the rule requiring certainty, where details of construction do not appear, and cannot with reasonable diligence and cost be ascertained in advance, or which will be disclosed only in the doing of the work, or where there is any contingency which reasonable foresight would not observe.

ID.—ADJUSTMENT OF EXCEPTIONS.—Exceptions to the rule may occur in every work of considerable magnitude, and they must be left to be adjusted in accordance with general provisions in the contract, or by the discretion of the person or board supervising its performance.

ID.—EXCEPTIONS NOT INVALIDATING CONTRACT.—No exceptions to the rule can have the effect to invalidate the contract. It is held that certain provisions enumerated fall within exceptions to the rule, and do not make the contract void.

ID.—INTERPRETATION OF CONTRACT FOR IMPROVEMENT—RULES.—In interpreting the contract for the improvement of the road, the rule must be applied that the whole of the contract is to be taken together, so as to give effect to every part, each clause helping to interpret the other, and that the contract must receive such interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect.

ID.—STRICT CONSTRUCTION OF PROCEEDINGS IN INVITUM—INAPPLICABLE RULE.—The extreme strictness of construction against the validity of contracts made in proceedings *in invitum,* whether in all cases justifiable or not, is not to be observed in a proceeding for a road improvement, where the property-owners have already consented to the raising of the money by taxation of their property, and the officers are simply charged with the duty of expending it lawfully and in good faith for the purposes designated.

ID.—ELEVATIONS SHOWN BY ENGINEER—NEW ELEVATIONS ARISING FROM CHANGE OF PLANS BY SUPERVISORS.—Where, by the contract, the improvement was to conform in grade to the elevations shown upon the plans, "or to elevations which may be given by the engineer," and the supervisors were empowered to change the plans for the cuts, fills, slopes, and dimensions, and if a change was made thereunder, the engineer would necessarily have to furnish new elevations therefor, the contract did not give the engineer authority, of his own motion, to change the elevations, but only required the contractor to take changed elevations of the engineer, so far as they apply to changes made by the supervisors under this reservation of power, and the provision for changed elevations, so understood, is within the law.

ID.—PROVISION FOR CRUSHED ROCK OR GRAVEL TO BE CONSTRUED WITH CONDITIONS—COMPETITION FAVORED.—The provision that crushed rock or gravel, at the option of the contractor, may be used in the composition of the asphaltic macadam must be construed with the accompanying conditions prescribing the qualities and characteristics necessary to each kind of material to make it fit for the purpose, and authorizing the engineer of the commission to see that the material was up to the standard specified. The bidders were thus informed of the requirements in either case, and the provision tended to favor competition rather than to hinder it.

ID.—BOND TO SECURE COUNTY AGAINST SUITS BY PATENTEE—CONDITION —NON-REQUIREMENT OF LICENSEE—VALIDITY.—Where a bond was required to protect the county against suits by the patentee of asphaltic macadam, but not if it appears that the contractor had a license from the patentee, and it does not appear that any contractor could not obtain a license therefor upon payment of royalty, it was within the discretion of the supervisors to take proper precautions against loss by the county, and it does not appear that such conditional provision for a bond would favor one bidder above another, or tend to prevent fair competition.

ID.—BIDS FOR VARIOUS THICKNESSES OF MACADAM.—Where bids were asked on various thicknesses of macadam, and there is no foundation

for the claim that there was material difference in the profits to the contractor on any particular degree of thickness, the provision in the contract that the pavement should in general have a uniform thickness of four inches, and that the contractor should not reduce it without the consent of the engineer, does not affect the legality of the contract.

ID.—SURFACE COATING.—Where the surface coating was to be paid for by the square foot, the direction that it should be applied to the whole road or any part of it, as the engineer should decide, was not unlawful.

ID.—PROVISION FOR EXTRA WORK IN EXCAVATING SOFT SPOTS DEVELOPED BY HEAVY ROLLER.—The provision for extra work in excavating soft spots developed in the use of a heavy roller is valid, and comes within the rule regarding unforeseen contingencies.

ID.—DECISION OF ENGINEER AS TO PLACES WHERE GRAVEL FOUNDATION SHOULD BE LAID AND THICKNESS.—The specification that the engineer should decide as to the places where the gravel foundation should be laid and its thickness, is not objectionable, since the contractor is to be paid therefor at a fixed price per ton for the amount of gravel used. The decision of the engineer would not injuriously affect him.

ID.—SPECIFICATIONS FOR EXTRA WORK.—It is a wise precaution to insert in a contract for a large improvement specifications for the payment of extra work not included in the contract. It is not to be assumed that any extra work was contemplated to be done in an unlawful manner or to an unlawful extent.

ID.—ALTERATION OF PLANS—REDUCTION OF WORK.—If an alteration of the plans authorized to be made under the contract results in a reduction of the work, the contractor would not be entitled to the full price, but the county would be entitled to a reduction in price in proportion to the decrease in the work, such reduction to be computed at the contract rate as far as possible.

ID.—QUANTUM MERUIT FOR EXTRA WORK.—Where work is due under a special contract at estimated or stipulated prices, and there is a deviation from the original plan by consent of the parties, the estimated or stipulated price is not excluded, but is the rule so far as the special contract is concerned, and for the extra work he is entitled to recover upon a *quantum meruit*.

ID.—JUST PROVISION FOR EXTRA WORK.—In view of the principle allowing an appropriate reduction in the price in the event of decreased work, a provision for compensation for extra work is fair as to all parties, and cannot be supposed to prevent competition in bidding.

ID.—INVALID PROVISIONS—EXCLUSION OF UNNATURALIZED ALIENS.—The provision in the specifications that, except by permission of the highway commissioners, no unnaturalized alien shall be employed, is invalid and unenforceable when attempted by public authorities, who have no right to put restriction upon the contractor which can only hinder the work and which constitutes a direct attempt to discrim-

inate against one class of *bona fide* residents of the state in favor of another class, and violates treaty obligations and the principles of the constitution.

Id.—Violation of Provision by Contractor.—A violation of such provision by the contractor would not defeat his right to recover the contract price upon the performance of the work.

Id.—Performance of Work in Good Faith—Money Raised upon Bonds—Presumed Knowledge and Disregard of Provision.— Where the contract has been let, the work has been performed under it in good faith, and the people have voted the bonds and realized the money therefrom and no facts have been shown to indicate that such provision had any effect upon the bids, the contractor must be presumed to have known that it was void, and to have disregarded it, and to have made his bid with that understanding.

Id.—Invalid Specification Collateral to Improvement—Validity of Contract.—The invalid specification did not concern or affect the character of the improvement, but was wholly collateral thereto, and the presumption being that the parties disregarded the collateral and invalid specification, and there being nothing tending to prove or indicate the contrary, it follows that the contract was properly awarded and lawfully made.

Id.—Allowance to Contractor by Supervisors—Refusal of Auditor to Issue Warrant—Mandamus.—Where, after the contract was fully performed and the board of supervisors had allowed a claim against the "highway improvement fund" for work done in the construction of the road in question and the county auditor refused to draw his warrant upon such allowance, *mandamus* will lie to compel him to draw the same.

PETITION for Writ of Mandate to the County Auditor of San Joaquin County.

The facts are stated in the opinion of the court.

J. A. Plummer, and Bishop, Hoefler, Cook & Harwood, for Petitioner.

Arthur L. Levinsky, for Respondent.

SHAW, J.—The defendant is the county auditor of San Joaquin County. The petition prays that a writ of mandate issue from this court directing the defendant, as such auditor, to draw a warrant on the county treasurer in favor of petitioner for the amount of a certain claim allowed by the board of supervisors of the county payable out of the "highway improvement fund" for work done in the construction of a.

road in said county in performing a contract made by the board of supervisors with the petitioner under the provisions of the statute of March 19, 1907, known as the "Good Roads Law" (Stats. 1907, p. 666). Sections 4, 10, and 11 of the act were amended in 1909 (Stats. 1909, p. 154). These pro-. ceedings were begun before the amendments took effect and were concluded afterwards, but the changes made in the law do not affect the validity of the contract in question.

The defendant claims that the proceedings upon which the contract rests were defective in particulars of such substantial importance that the contract is thereby rendered invalid. The force of the objections to the validity of the proceedings will be better understood by a preliminary statement of the provisions of the act. It provides for the appointment by the county board of supervisors of a "highway commission" of three members. This commission is empowered to ascertain which of the main public highways of the county should be improved and to determine what new highways are necessary and the kind of improvement to be made thereon, and to estimate the cost of the respective improvements and new roads and make maps thereof showing the connecting roads. It must thereupon make a report to the supervisors showing the roads to be improved or made "describing generally the kind of improvements to be made thereon," stating the estimated cost and the amount to be raised by bonds thereon, and praying the supervisors "to call an election for the issuance of bonds of the county therefor, for the estimated amount." The supervisors, if they adopt the report, are required to call an election to determine whether bonds shall be issued. Any defect or irregularity in the proceedings prior to calling the election shall not affect the validity of the bonds. The money derived from the sale of the bonds is denominated the "highway improvement fund" and must be used solely for the purposes authorized by the act. The work for which the bonds are voted is to be done under the direction of the highway commission, but final acceptance is committed to the supervisors. These provisions are contained in the first eight sections of the act. The remaining sections provide for the actual work of construction or improvement.

If the bonds are authorized and sold, the commission is required to prepare detailed specifications, plans, and profiles

for the work, or such part as it deems it desirable to have done separately, and present the same to the supervisors who shall either adopt or reject the same as presented. If adopted, the supervisors may then advertise for bids for the work in accordance with the plans, profiles, and specifications and the contract shall be let to the lowest bidder who will give a good bond. The supervisors may authorize the highway commission to buy the material, hire the labor, and have the work done without a general contract, but in that case all contracts for the purchase of materials, tools, or appliances, amounting to more than one thousand dollars, shall be let to the lowest bidder, upon due notice. Any part of the work which does not cost more than one thousand dollars, the board of supervisors may authorize the commission to do by contract without advertisement for bids. (Sec. 9.)

The board of supervisors of San Joaquin County appointed a highway commission for that county as provided in the act. On February 11, 1909, the commission made and filed a report to the supervisors recommending the improvement of twenty-three roads, designated as main public highways and described by their termini and general courses, and stating generally the kind of improvements to be made thereon. The supervisors adopted the report. The estimated cost of the proposed improvements was $1,890,000. An election was duly called and held and bonds to that amount were thereby authorized. Sales of part of these bonds were made for the sum of $320,512, which was placed in the county treasury and set apart as the "highway improvement fund." The commission thereupon decided to have the work on one of the roads, known as the Lower Sacramento Road, done separately, and prepared and presented to the supervisors detailed plans, profiles, and specifications thereof. On September 20, 1909, the supervisors adopted the same. Notices were duly given for bids and the contract for that work was duly let to the plaintiff and on October 11, 1909, the same was executed and the plaintiff gave the required bond. The plaintiff proceeded to do the work and on December 30, 1909, there became due to it, by the terms of the contract, for work done thereunder, the sum of $4,969.03, for which the claim in question was made and allowed.

The preliminary report made by the commission on Feb-

ruary 11th and adopted by the supervisors in "describing generally the kind of improvement to be made" on the roads mentioned, stated that, where an asphaltic macadam pavement was made, it should be "composed of a mixture of the best grade of hard, tough crushed stone, the best asphalt and other materials which will insure a pavement capable of sustaining in satisfactory manner the exceedingly heavy traffic to which it will be subjected." Also that, "in general" the macadam would not exceed seven inches nor be less than four inches in thickness on soil which furnished a good foundation.

The specifications afterwards made by the commission and adopted by the supervisors for the work to be done on the lower Sacramento road, as provided in section 9 of the act, allow either gravel or crushed rock to be used in the composition of the asphaltic macadam, at the option of the contractor, subject, however, to certain requirements as to quality and to the approval of the engineer employed by the commission. Other slight deviations from the preliminary report were made, but it is not necessary to state them further.

The defendant contends that these discrepancies between the preliminary report and estimate on which the bonds were voted and the detailed specifications for the particular road improved, as afterwards prepared and adopted before letting the contract, made the entire proceeding void. We do not so understand the law. The preliminary investigation, statement of improvements to be made, and estimate of the cost are intended to be general in terms, the purpose being merely to give information to the supervisors and the voters as to the general character of the work for which bonds were supposed to be necessary. The commission is required to ascertain "the kind of improvement to be made" (sec. 4), and having done so, to make a report "describing generally the kind of improvements to be made." (Sec. 6.) It was never intended that this report should go into detail, or that a slight or reasonable departure therefrom in the final specifications for the doing of the work, not destructive of the general plan proposed, should render the contract void. The main purpose of this report is served when the election is called and held. If the bonds are authorized and the money obtained thereon the supervisors and the commission have power to expend it for the improvement of the roads mentioned in the report.

They must adhere to the improvement mentioned in the general plan recommended and described in the report, but it would require a radical departure from that description to invalidate a contract thereafter made in good faith. No mere variation in the details constituting the same kind of an improvement would produce that result. We have nothing more serious here.

It is contended that the contract is invalid because of certain provisions incorporated in it, and because it was not let in the manner required in the act. The statute gives the supervisors power, where the cost exceeds one thousand dollars, to have the improvement made in either one of two modes: either by letting it on contract to the lowest bidder, or by authorizing the commission to do it directly without a general contract, in which case, however, contracts for materials to an amount exceeding one thousand dollars must be let to bidders after due notice. The contract method was adopted.

The statute requires an advertisement for proposals to do the work in accordance with the plans, profiles, and specifications adopted by the supervisors. It is a general principle of law applying to the letting of contracts for public work to the lowest bidder, upon plans and specifications previously adopted, that they must be sufficiently certain and definite, upon all the details of the work which materially affect its cost, to apprise bidders of all the essential and substantial parts of the work and enable them to know with reasonable accuracy the outlay they will have to make in performing the work to be contracted for. This is thoroughly established in the case of public improvements of streets, where the cost is raised by assessment upon the property of owners within the district specially benefited thereby. (*Piedmont P. Co.* v. *Allman,* 136 Cal. 89, [68 Pac. 493]; *California I. Co.* v. *Reynolds,* 123 Cal. 92, [55 Pac. 802]; *Grant* v. *Barber,* 135 Cal. 191, [67 Pac. 127]; *Stansbury* v. *White,* 121 Cal. 437, [53 Pac. 940]; *Chase* v. *Scheerer,* 136 Cal. 251, [66 Pac. 768]; *Perine* v. *Pasadena,* 116 Cal. 9, [47 Pac. 777]; *Warren* v. *Chandos,* 115 Cal. 385, [47 Pac. 132].) The reason for the rule, as applied to such work, is in part because such uncertainty deprives the property-owners of the knowledge necessary to enable them to undertake the work themselves, as the

statute provides they may, and in part because it deprives
bidders of like knowledge and thereby tends to prevent the
fair competition and resulting low cost of the work, which is
the principal object of the provision.  The latter reason is
as persuasive as the first, it is sufficient to support the rule,
and it applies as well where the cost is to be paid with money
already raised by taxation or by the sale of bonds, as where
it is to be raised after the work is done by assessment upon the
benefited property.  (*Santa Cruz etc. Co.* v. *Broderick,* 113
Cal. 631, [45 Pac. 863]; *Ertle* v. *Leary,* 114 Cal. 241, [46 Pac.
1]; *American C. Co.* v. *Licking Co.,* 31 Ohio St. 415; *Detroit*
v. *Hosmer,* 79 Mich. 388, [44 N. W. 622]; *Fones Bros. Co.* v.
*Erb,* 54 Ark. 645, 13 L. R. A. 353, [17 S. W. 7]; *Andrews* v.
*Board,* 7 Idaho, 457, [63 Pac. 592]; *Gage* v. *New York,* 110
App. Div. 403, [97 N. Y. Supp. 157]; *McBrian* v. *Grand
Rapids,* 56 Mich. 99, [22 N. W. 206], 11 Cyc. 481; 20 Am. &
Eng. Ency. of Law, p. 1167.)

There is a well-recognized exception to this rule in the case
of details of construction which do not appear and cannot
with reasonable diligence and cost be ascertained in advance,
or which will be disclosed only by the doing of the work; or
any contingency which reasonable care and consideration
would not foresee.  Such things may occur in every work of
any considerable magnitude, and they must be left to be
adjusted in accordance with general provisions of the con-
tract, or by the discretion of the person or board supervising
its performance.  Examples of·such details, and of lawful
provisions for their determination, were considered in *Haugh-
awout* v. *Hubbard,* 131 Cal. 679, [63 Pac. 1078]; *Belser* v.
*Allman,* 134 Cal. 400, [66 Pac. 492]; *Banaz* v. *Smith,* 133 Cal.
106, [65 Pac. 309]; *Haughawout* v. *Raymond,* 148 Cal. 311,
[83 Pac. 53]; *Chase* v. *Scheerer,* 136 Cal. 251, [66 Pac. 768],
and *McCaleb* v. *Dreyfus,* 156 Cal. 204, [103 Pac. 924].  Of
the provisions objected to in this case, the following come
within this class and do not invalidate the contract.  The
contractor must grade the connections with intersecting roads
to the satisfaction of the engineer employed by the commis-
sion.  He was allowed to take water from the county wells
and tanks along the road, but if that was insufficient he was
required to obtain the necessary quantity from other sources
at his own expense.  A method of mixing the asphaltic cement

was recommended, but any other method was permitted, provided it would result in coating every particle of the stone, sand, and dust with the asphaltic cement. If compelled to cease work temporarily, the contractor was required to leave in a passable condition during the winter, the part of the road upon which he had worked. The statute limits the width of the roadway made with these funds to sixteen feet. Public roads must be at least forty feet wide. The sole purpose of this clause is to secure a way for public travel, and it would be substantially complied with if the portion of the public road not occupied by the pavement was made fit for that purpose. During the progress of the work he must maintain a roadway for traffic, either alongside the pavement on the highway, or on private land adjoining, "unless in the judgment of the engineer, it is a physical impossibility to do so." Soft material encountered was to be removed as directed by the engineer. The earth for embankments and shoulders was to be of a quality satisfactory to the engineer. All of these provisions come within the exception above stated. They do not make the contract void.

In connection with the provisions to be now considered, it is to be observed that the rules for the interpretation of contracts declare that "the whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other," and that "a contract must receive such an interpretation as will make it lawful, operative, definite, reasonable and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, secs. 1641, 1643.) Another consideration applicable to this case is that it is not, strictly speaking, a proceeding *in invitum.* The property-owners have been consulted and have by their votes sanctioned and approved the proposed improvement. It is not being made without their previous consent or against their will. The extreme strictness of construction against the validity of contracts made in proceedings *in invitum,* whether in all cases justifiable or not, is not to be observed in proceedings of this character, where the property-owners have already consented to the raising of the money by taxation of their property and the officers are simply charged with the duty of expending it lawfully and in good faith for the purposes designated.

The fills and approaches to all bridges, culverts, and drains were to be graded to the elevations shown upon the plans, "or to elevations which may be given by the engineer." Another clause reserves to the supervisors power to change the plans for the cuts, fills, slopes, and dimensions. If a change was made under this authority, the engineer would necessarily have to furnish the new elevations required by the change. The provision quoted does not give the engineer authority to change the elevations of his own motion, but requires the contractor to take the engineer's elevations so far as they apply to changes made by the supervisors under this reservation of power. Thus understood, the provision is within the law.

The provision that crushed rock, or gravel, at the option of the contractor, may be used in the composition of the asphaltic macadam, must be considered in connection with the accompanying conditions prescribing the qualities and characteristics necessary to each kind of material to make it fit for the purpose, and authorizing the engineer of the commission to see that the material used is up to the standard specified. The bidders were thus informed of the requirements in either case. The provision tended to favor competition, rather than to hinder it.

In addition to the bond for the faithful performance of the contract, which the statute requires, the specifications provided that the contractor should give a bond in a sum equal to fifty cents for each square yard of asphaltic macadam to be laid, to secure the county against loss by reason of suits which might be brought within two years after final payment for the work, by any person claiming patent rights covering the class of pavements specified. The bond was not to be required if the contractor satisfactorily proved that he had a license from such patentee. It is not shown or suggested that the license to use such patent, if there was any, was not available to any person who would pay the royalty. It was within the discretion of the supervisors to take such precautions for the protection of the county, and it does not appear that the provision would favor one bidder above another, or tend to prevent fair competition.

The bidders were required to submit bids specifying separately the prices for which they would do separate parts of the work, as follows: "I. Grading in lump sum for the whole

work. II. Gravel in place—per ton. III. Asphaltic macadam pavement, per square foot: 1. Three inches in thickness; 2. Four inches in thickness; 3. Five inches in thickness. IV. Surface coating, per square foot." The specifications also gave estimates of the respective amounts of each class of work required. The bids and the contract were made in accordance with the above provision. Many of the objections are fully answered by a consideration of the effect of this method of taking bids and making the contract. There is no foundation in the evidence for the claim that there was any material difference in the profits to the contractor in laying macadam of one thickness over that to be made in the other. Hence the provision that the pavement should in general have a uniform thickness of four inches and that the contractor should not reduce it without the consent of the engineer, does not affect the legality of the contract. So, also, with respect to the liquid surface coating, the direction that it was to be applied upon the whole road, or any part of it, as the engineer should decide, was not unlawful in view of the contract that the payment was to be made by the square foot for the amount actually applied.

The profile and cross-sections showed that the gravel foundation, or the pavement itself where gravel foundations were not required, was to be in general laid upon the existing surface of the road. This was to be rolled with a heavy roller weighing not less than three hundred and fifty pounds per lineal inch. Where a subgrade was to be made by excavation, that also was to be rolled in like manner. If soft spots developed under such rolling, they were to be excavated to a depth of two feet and then filled with clean, dry earth or gravel. The foundation was to be of gravel wherever directed by the engineer and was to be not less than three inches thick after compacting, or thicker, if so directed by the engineer. The provisions for extra work in excavating the soft spots which might be developed when the heavy roller was applied, comes within the rule regarding unforeseen contingencies, declared in *Haughawout* v. *Hubbard,* 131 Cal. 679, [63 Pac. 1078], and the other similar cases above cited. The specification that the engineer should decide where the gravel foundation should be laid and its thickness, is not objectionable, since by the contract, the contractor is to be paid for laying such founda-

tion at a fixed price per ton for the amount of gravel used therein. The decision of the engineer could not injuriously affect him.

The specifications contained the following provisions regarding extra work:—

### "Extra Work.

"The board of supervisors reserve the power to change, at the recommendation of the highway commission, during the progress of the work, any cuts, fills, slopes, dimensions and alignments from those specified or appearing upon the plans.

"If such changes should, in the judgment of the engineer, entail an additional expense upon the contractor above that contemplated by him, the board of supervisors and the commission shall have power to agree with the contractor upon a price over and above that named in the contract, for such additional work, and the contractor shall be paid for such additional work as if it had been included in the original bid upon the work."

It is always a wise precaution, in making contracts of this magnitude, to insert provisions to control the case of extra work which may appear to be necessary or desirable while the construction is going on. As was remarked in *Kitchel* v. *Union County*, 123 Ind. 540, [24 N. E. 366]: "No prudent individual would make a contract for the construction of a building of any magnitude without incorporating a provision somewhere making specific and definite arrangements concerning extra work." The statute gives the supervisors power to authorize the highway commission to contract for any work, or for any part of an improvement, without letting it out to bidders, provided the cost thereof does not exceed one thousand dollars. And they were empowered, in their discretion, "to authorize the highway commission to purchase the necessary material, purchase or hire tools and appliances, and hire laborers, and to do the work or any part thereof without letting any contract therefor." (Sec. 9.) Extra work is, of course, work not included in the contract. Under the above provisions it was entirely lawful for the board to agree for the performance of such work without the formality of letting it out to bidders, if it did not exceed one thousand dollars in cost. And for that purpose it was within their power to agree in advance with the contractor that he should do

CLVIII Cal.—21

the extra work at a price to be afterward agreed upon, if it did not exceed one thousand dollars. Or they might, under the second provision of the statute above quoted, authorize the commission to agree with the contractor to do the extra work under the supervision of the commission, even if it cost more than one thousand dollars. The only restriction upon this power is in the additional provision that in that event contracts for materials, tools, or appliances necessary, and amounting to more than one thousand dollars, must be advertised and let to the lowest bidder. We cannot assume that the supervisors, by this provision in the specifications, contemplated the doing of such extra work in any unlawful manner, when the statute clearly gives them power to accomplish it lawfully in a specified mode. We must presume that they intended to proceed lawfully and within their powers, and hence the contract in question is not made illegal by this specification so far as the extra work is concerned. If they should attempt to go beyond their powers, the taxpayers have other remedies and means to prevent it, and the possibility that this may be attempted does not invalidate the proceedings.

It is suggested that the power to change the cuts, fills, dimensions, and alignments, authorized changes which will greatly reduce the amount and cost of the work, that the specifications in question do not provide for any reduction in the price to correspond with such reduction in cost; that, in that event, the law would give the contractor the right to the full compensation named in the contract for full performance; and that this would open the door to gross frauds between the contractor and the supervisors, if they should act in collusion to reduce the cost without reducing the contract price. If this was the necessary effect of such power there might be no answer to the argument. But we do not think this is the law. We are of the opinion that if an alteration in the plans caused a material reduction in the amount of the work, the contractor would not be entitled to the full price, and that, to the contrary, the county would be entitled to a reduction in the price in proportion to the decrease in the work, such reduction to be computed at the contract rate so far as possible. With regard to everything except the grading, the contract furnished the ready means for calculating the deduction from the price. The gravel was to be paid for at

so much per ton for the amount used; the macadam at a price per square foot for the area laid; the surface coating in the same way. Any change in the plans operating to reduce these items would automatically work a deduction from the estimated contract price, by the terms of the contract itself. There was no estimate of the amount of the grading and the contract provided that the lump sum of eighteen thousand dollars was to be paid therefor. The plans, profiles, and specifications, however, showed the elevations of the various grades above or below the natural surface, their length, width, and slope, and from these data the number of cubic yards of excavation or fill required could. be readily calculated and the average price per yard ascertained. The reasonable value of grading work omitted by reason of any alteration could be determined. In cases where extra work is caused by authorized deviations from a building contract, and no agreement is made regarding the price thereof, or payment therefor, the law implies an agreement by the owner to pay the reasonable value of the extra work. In *Dubois* v. *Del. & H. C. Co.,* 4 Wend. (N. Y.) 291, it is said: "Where work is done under a special contract at estimated (stipulated) prices, and there is a deviation from the original plan by the consent of the parties, the estimate is not excluded, but is to be the rule of payment as far as the special contract can be traced; and for the extra labor, the party is entitled to his *quantum meruit.*" This rule is supported by the following cases: *Aikin* v. *Bloodgood,* 12 Ala. 224; *Clark* v. *Mayor,* 4 N. Y. 343, [53 Am. Dec. 379]; *Reed* v. *Phillips,* 4 Scam. (Ill.) 42; *H. E. etc. Ry. Co.* v. *Snelling,* 59 Tex. 119; *Wright* v. *Wright,* 11 Ky. 180; *Jones* v. *Adams,* 12 La. Ann. 621; *Holmes* v. *Stummel,* 17 Ill. 455; *Goldsmith* v. *Hand,* 26 Ohio St. 107; *Jewett* v. *Weston,* 11 Me. 349; *White* v. *Oliver,* 36 Me. 92; *Hayward* v. *Leonard,* 24 Mass. (7 Pick.) 187, [19 Am. Dec. 268]; *Jones* v. *Woodbury,* 11 B. Mon. (50 Ky.) 169; *Hood* v. *Smiley,* 5 Wyo. 70, [36 Pac. 856]; *De Boom* v. *Priestley,* 1 Cal. 206; *O'Connor* v. *Dingley,* 26 Cal. 21; *Mowry* v. *Starbuck,* 4 Cal. 274; *McCormick* v. *Connolly,* 2 Bay, (S. C.) 404; 3 Sutherland on Damages, sec. 707; 2 Sedgwick on Damages (8th ed.), sec. 655. In *H. E. etc. Ry. Co.* v. *Snelling,* 59 Tex. 119, in which there was a contract for the construction of a railroad, the court says: "If the line of the road was changed after the

contract was made, and Snelling was required to construct it upon the new line, and did so, the law would imply an agreement to compensate him for such additional cost of construction as the new line imposed, in the absence of some agreement to the contrary. But in case of such deviation from the contract, by consent, which completion of the new line by the contractor, without protest, would seem to imply, it would seem that the original contract, so far as can be, should regulate the price for the work."

Where the consent of the parties to an alteration is secured by a reservation of power in the employer to make such changes, inserted in the original contract, the rule must necessarily be the same, with respect to the right to compensation for extra work caused thereby, or to a deduction from the price for work omitted thereby, as when the alteration is made by consent after the work is begun.

It is established that in such cases the contractor is entitled to charge and receive the reasonable value or cost of the extra work caused by the alteration. Upon the same principles, it must also be held that the employer or owner is entitled to a reasonable deduction from the contract price, if the changes thus made by authority or consent have materially lessened the amount and cost of the work required by the original contract, and that such deduction should be made at the contract rate for the work omitted, so far as practicable. The rule is thus stated in 3 Sutherland on Damages, section 709: "It often occurs that a partial rescission results from deviations from the original plan and contract, made by deliberate and explicit direction of the employer, or with his consent and acquiescence, and by such departures other work is substituted with other prices agreed to, or implied. In such cases the omission of the particular work excluded by the substitution is not a violation of, but is dispensed with by modifying the contract. . . . The contractor may then be entitled to recover the contract price with increase or subject to such diminution as is produced by the change of plan, on a *quantum meruit.*" The following cases hold that, in case the work is materially diminished by such alteration, the employer is entitled to have the contract price proportionately reduced. (*Holmes* v. *Stummel,* 17 Ill. 455; *Goldsmith* v. *Hand,* 26 Ohio St. 107; *Jewett* v. *Weston,* 11 Me. 349; *White* v. *Oliver,* 36 Me. 92; *Wright* v.

*Wright,* 11 Ky. 180.) The reason of this rule is practically the same as in the numerous cases holding that a slight failure of the contractor to make complete performance is not sufficient to defeat his right to recover the contract price, less a reasonable deduction for the imperfections. This is the rule where the imperfections are not fraudulent, but are made by accident or inadvertence, and are not of sufficient extent to constitute a substantial departure from the original plan. The employer is presumed to agree to take the completed structure as it is, with the implied agreement by the contractor to make the proper deduction from the price and the recovery is upon the contract and not upon the *quantum meruit.* (See *Perry* v. *Quackenbush,* 105 Cal. 308, [38 Pac. 940] ; *Marchant* v. *Hayes,* 117 Cal. 672, [49 Pac. 840] ; *Elliott* v. *Caldwell,* 43 Minn. 361, [45 N. W. 845] ; *Crouch* v. *Gutmann,* 134 N. Y. 45, [30 Am. St. Rep. 608, 31 N. E. 271].) An alteration from the original plan, decreasing the grading, under the contract in the case at bar could not be said to be a breach of the contract, since the contract authorizes it. But, as it does not provide for a decrease of the price corresponding to the decrease in the grading, it would be necessary to resort to the general principles of the law of implied contracts. The county, in that event, would be entitled to deduct from the contract price for the grading a proportion thereof equal to the proportion which the omitted portion of the work of grading, would bear to the whole work, with reasonable allowances to either party for any material variations in the expense of such omitted grading, arising from conditions different from the average. This being the rule, the provision for extra work is fair to all parties and cannot be supposed to have had a tendency to prevent competition in bidding.

The provision of the specifications to the effect that, except by permission of the highway commission, no unnaturalized alien shall be employed in the work, is invalid and unenforceable when attempted by public authorities. The constitution provides that all men have the inalienable right of enjoying liberty and acquiring property, and that foreigners of the white race, eligible to citizenship, while *bona fide* residents of the state, shall have the same right to acquire property as native born citizens. (Const., art. I, secs. 1, 17.) Laws forbidding the employment of aliens have been held invalid.

(*Chicago* v. *Hurlbert*, 205 Ill. 363, [68 N. E. 786] ; *People* v. *Warren*, 34 N. Y. Supp. 943, [13 Misc. 615].) Such a law would violate the treaties with almost all the nations from which this country receives immigrants. (See *Estate of Ghio*, 157 Cal. 552, [108 Pac. 516].) The statute in question charges the supervisors with the duty of administering the scheme for building roads, but it does not purport to confer power to make or enforce a provision of this character. They have, no doubt, a wide discretion as to the manner of carrying on the work and may adopt any measure reasonably tending to facilitate the same, or perhaps any which may incidentally further any laudable public purpose. But they are not given authority to put restrictions upon the contractor which can only hinder the work, which make it more expensive, and which have no relation whatever to the thing to be done, or to any conceivable legislative purpose disclosed in the statute, and which would be a direct attempt to discriminate against one class of *bona fide* residents of the state and favor another, a violation of treaty obligations, and contrary to the principles of the constitution. No express authority for such a provision is given and we are satisfied that the supervisors have no implied power to impose such a mischievous and burdensome restriction. A violation of it by the contractor would not defeat his right to recover the contract price upon performance of the work.

It is not alleged or claimed that there were alien laborers at hand to do the work at less expense, or at all. It may be that if a taxpayer had endeavored to enjoin the letting of the contract, on the ground that this limitation of the specifications was void and that it tended to discourage bidders and make the work more expensive, the suit could have been maintained, or it may be that in a proceeding *in invitum*, where a stricter rule prevails, where the consent of the taxpayers has not been previously obtained and the money is yet to be raised from them by assessment, such a clause in the specifications would be fatal to the validity of the contract. This may be conceded, but we need not determine it. This case is not of that kind. The contract has been let, the work involved in this demand has been performed under it in good faith, and the people have voted the bonds and the money has been realized therefrom. No facts are shown to indicate that this clause

had any effect whatever upon the bids. In *People* v. *Featherstonhaugh,* 172 N. Y. 112, [64 N. E. 802], where a similar case was presented, the court held that the contractor must be presumed to have known that the clause in the specifications was void, and to have made his bid with that understanding, and that he was entitled to payment under the contract, notwithstanding such invalid clause in the specifications and contract. It appeared in that case that the courts had previously decided that the provision was void and that this was actually known to the successful bidder. But the court distinctly declares that the rule would be the same in the absence of such decision. In *People* v. *Coler,* 166 N. Y. 1, [82 Am. St. Rep. 605, 59 N. E. 716], a similar clause in the contract was held to be invalid. But it was further held that the contract was not void and that when such a contract has been made and has been performed by the contractor, the fact that he has violated the invalid provision is no defense to an action by him to enforce payment of the contract price. The same conclusion was declared in *Chicago* v. *Hurlbert,* 205 Ill. 363, [68 N. E. 786]; *Marshall* v. *Nashville,* 109 Tenn. 513, [71 S. W. 815], and *Cleveland* v. *Clements,* 67 Ohio St. 197, [93 Am. St. Rep. 670, 65 N. E. 885]. In *Inge* v. *Board,* 135 Ala. 202, [93 Am. St. Rep. 20, 33 South. 678], the work had not been performed and the suit was instituted by taxpayers to restrain its performance. It was an ordinary street improvement proceeding. There was a similar clause in the specifications and it was held that this prevented fair bidding and made the contract void. The point that it should be presumed to have been disregarded was not raised or considered. We think that the cases first cited above apply the better rule to be followed here. The void provision did not in any respect concern or affect the character of the improvement to be made, but was wholly collateral thereto. The case does not come within the scope of the rule that public corporations are not estopped by benefits received from the actual performance of an *ultra vires* contract, as in *Zottman* v. *San Francisco,* 20 Cal. 96, [81 Am. Dec. 96], and the numerous cases following the rule there stated. The presumption being that the parties all disregarded the collateral and invalid specification and there being nothing tending to prove or to indicate the contrary, the conclusion logically

follows that, so far as this point is concerned, the contract was properly awarded and lawfully made.

Some other supposed defects are alleged in the answer, but they were not urged upon the argument and we will assume that they are not of sufficient importance to merit consideration.

Let the writ issue as prayed for.

Angellotti, J., Sloss, J., Lorigan, J., and Henshaw, J., concurred.