[Civ. No. 22644.   First Dist., Div. Two.   Nov. 29, 1966.]

BENSON ELECTRIC COMPANY, Plaintiff and Respondent, v. HALE BROTHERS ASSOCIATES, INC. et al., Defendants and Appellants; GENERAL ELECTRIC COMPANY, Intervener and Respondent.

Chickering & Gregory and William L. Ferdon for Defendants and Appellants.

Anderson & Borello and Daniel Anderson for Plaintiff and Respondent.

Cooley, Crowley, Gaither, Godward, Castro & Huddleson and Arthur T. Berggren for Intervener and Respondent.

AGEE, J.—Defendants appeal from a judgment of the trial court foreclosing a mechanic's lien in favor of plaintiff Benson Electric Company (hereafter Benson) in the amount of $4,534.05 and intervener General Electric Company in the amount of $10,965.95, or a total sum of $15,500. Personal judgment in like ratio was entered against defendant Millbrae Bowling Corporation (hereafter Millbrae) alone.

The subject property is located on El Camino Real in Millbrae, on it now standing the completed King's Bowl. In 1960, the then unimproved realty was owned in fee by defendant Hale Brothers Associates (hereafter Hales), subject to the leasehold interest of Millbrae, a corporation in which Harold

Dobbs was the sole stockholder. In 1963, Dobbs acquired the fee from Hales, still subject to the leasehold of Millbrae.

Millbrae began construction of King's Bowl in 1960. Robert McLean was a licensed contractor and proficient in this sort of construction. However, he was unable to secure the necessary bonding to contract directly with Millbrae as its general contractor.

Consequently, Millbrae engaged McLean as its general superintendent at a salary of $1,000 per month, month-to-month. He supervised general construction work directly, but the general construction workers were employed by Millbrae. Although he negotiated with other contractors for the project, he did not contract with any of them.

Rather, such contracting was done on behalf of Millbrae by Ferdinand Masberg, its fully authorized agent. Benson entered into one such written contract with Millbrae on May 2, 1960. Benson was to install the electrical system in the bowling alley according to specifications furnished by Millbrae.

Section 1193.1, subdivision (c), of the Code of Civil Procedure provides: "The owner shall within 10 days after the completion of the work of improvement file for record a notice of completion. . . . If such notice be so filed, then, . . . every original contractor must within 60 days after the date of filing for record such notice, and every person, other than an original contractor, claiming the benefit of this chapter must within 30 days after the date of filing for record such notice, file for record his claim of lien."

The record amply shows that Benson contracted directly with defendant Millbrae, that Millbrae was the lessee, and that Hales was the owner-lessor. Hales filed notice of completion on September 8, 1960. Benson filed claim of lien on November 7, 1960, which was within 60 days of the notice of completion.

The issue is whether one who contracts directly with a lessee who is in command of construction is an "original contractor" within the meaning of the above section. Appellants contend Benson had only 30 days to file claim of lien.

The parties have based their respective arguments on the assumption that an "original contractor" must have a direct contract with the *owner*. Thus, they focus on whether a *lessee* is an owner within the meaning of section 1193.1, subdivision (c).

However, whether a lien claimant is a subcontractor or an original contractor does not depend upon ownership interest, but rather on the rank of the particular contract in ques-

tion in relation to all the construction contracts concerning the project. The issue is the relationship of all the contractors *inter sese*.

Unless some adverse possessor initiates the project, it must be started by a person with *some* estate in the property, whether as fee owner, life tenant, remainderman, lessee, or whatever. The interest of such person becomes important only when determining the extent of the lien.[1]

In *Peterson* v. *Freiermuth* (1911) 17 Cal.App. 609 [121 P. 299], the plaintiff contracted with a lessee to extensively remodel the building on the leasehold for a price in excess of $5,000. The court affirmed a judgment for the defendant-lessor, entered after an order sustaining a demurrer. At that time, the code required any contract for a sum over $1,000 to be in writing and filed with the county recorder, and this was not done. Such requirement did not apply if the lien claimant was a materialman rather than a contractor. The court held there could "be no room for doubting that the plaintiff was an *original contractor.*" (P. 614; italics supplied.)

In *Hihn-Hammond Lumber Co.* v. *Elsom* (1915) 171 Cal. 570, 574 [154 P. 12, Ann.Cas. 1917C 798], the court offered this analysis: "Section 1194 [as then enacted] divides the liens which can be asserted against property under the mechanic's lien law into four classes, to wit, laborers, materialmen, subcontractors, and original contractors. The meaning of the term 'subcontractors,' as there used, must be determined by reference to this classification and to the subject to which it relates. The original contractor is the person who agrees with the owner to construct a building on his property. Those who perform labor in the construction of the building come within the first class, as laborers. Persons who merely furnish material to the contractors to be used, and which are used, in the construction of the building come within the second class, as materialmen. The term 'subcontractor' embraces all persons who agree with the original contractor to furnish the material and construct for him on the premises some part of the structure which the original contractor has agreed to erect for the owner."

Thus, in the *Peterson* case, when deciding if a particular lien claimant was or was not a materialman, the court said:

[1]Section 1183.1, subdivision (a), provides: that only the interest of the party causing the construction is subject to lien. However, subdivision (b) provides that the interest of any *other* party is also subject to lien unless he has no knowledge of construction, or unless, after he acquires such knowledge, he files a notice of nonresponsibility.

"In such cases [if the claimant furnishes both extensive labor and material] the persons who furnish materials cease to be materialmen *and become original contractors or subcontractors as the facts of the case may be.*" (*Peterson* v. *Freiermuth, supra,* 17 Cal.App. at p. 614; italics supplied.) And that a lien claimant contracts with a lessee rather than a fee owner was not noted as a material fact on this issue.

The two cases above cited, as well as many other decisions containing a definition of "materialman," have been discussed recently in *Theisen* v. *County of Los Angeles* (1960) 54 Cal.2d 170, 180-182, footnotes 5 and 6 [5 Cal.Rptr. 161, 352 P.2d 529]. An examination of these cases discloses that the issue was *either* materialman versus contractor *or* materialman versus subcontractor, and further that whether the court used the term "original contractor" or "subcontractor" depended *factually* on whether the lien claimant undertook the construction directly, or whether he undertook to perform a portion of the work which the party with whom he contracts had himself contracted to perform for another.[2]

In the usual situation the owner of the property, or, as in the instant case, a lessee, will contract with one general contractor (an original contractor) who is responsible for the project, and who will, in turn, let out other subcontracts for specific portions of the work. Section 1193, subdivision (c), concerning 15-day pre-lien notice, seems to equate "original contractor" with "general contractor."

However, it is not essential to have such a general contractor. Section 1193.1, subdivision (b), refers to the situation where the owner himself provides for the various portions of the construction, contracting, that is, directly with those who in the usual situation would be subcontractors. If such is true, then each of these contractors is an original contractor having 60 days to file claim of lien.

Thus, had Benson (as well as the other contractors for

---

[2]The *Theisen* case expressly disapproved of all the cases cited in the footnotes referred to. However, this disapproval was based upon prior definitions of materialman used to distinguish such from either an original contractor or a subcontractor.

The *Theisen* case did not consider the distinction between "original contractor" and "subcontractor." The court held: "In our opinion the essential feature which constitutes one a subcontractor rather than a materialman is that in the course of performance of the prime contract he constructs a definite, substantial part of the work of improvement in accord with the plans and specifications of such contract, not that he enters upon the job site and does the construction there." (*Theisen* v. *County of Los Angeles, supra,* 54 Cal.2d at 183.)

the King's Bowl project) contracted directly with Hales instead of Millbrae, no one could contend that Benson was not an original contractor. The fact that a lessee, Millbrae, initiated construction and entered into these various contracts does not alter the result. Benson was an original contractor and timely filed claim of lien within 60 days.

Appellants additionally contend that finding Benson an original contractor is contrary to the allegations of Benson's complaint. The original complaint and the first amended complaint both alleged that McLean was the "original contractor," although the latter added that Benson also was an "original contractor." Since the claim of lien was filed more than 30 days after the notice of completion, a demurrer was sustained to both complaints on the ground that the lien was barred under section 1193.1.

Benson cured the defect by alleging additional work was performed at the request of the "original contractor" on October 7, which would be within the 30-day limit.

On the second amended complaint the case went to trial. It is clear from the record that one of the primary issues litigated was the exact relationship between McLean, Benson and Millbrae. It is equally clear that McLean was shown to be an employee and that Benson contracted with Millbrae.

Benson then offered a third amended complaint to conform to this proof, alleging that Benson was an "original contractor" and, as such, was allowed the 60-day limit. This is substantially the same as the first amended complaint. Unfortunately, this complaint still contains an ambiguous reference to McLean as an "original contractor," apparently caused by Benson's pleading the contents of the notice of completion *in haec verba*.

Appellants argue this is an admission that McLean was the general contractor and Benson the subcontractor, and that findings to the contrary must be ignored. However, discussion between court and counsel shows a clear intent to plead Benson as an original contractor. The complaint is at most ambiguous.

Moreover, even if McLean *did* have the original, or general, contract for the construction, this would not destroy Benson's standing as an original contractor. There can be more than *one* such. And the record shows that Benson contracted with Millbrae, not McLean.

Section 1193, subdivision (a), of the Code of Civil Procedure provides that everyone, other than one under "direct

contract with the owner'' or one performing labor for wages, ''must, as a necessary prerequisite to the validity of any claim of lien subsequently filed, cause to be given not later than 15 days prior to the filing of a claim of lien a written notice as prescribed by this section, to the owner or reputed owner and to the original contractor.''

■ Appellants argue that Benson had no contract at all with Hales and that, since no 15-day notice was given Hales, the lien is fatally defective.

On substantially identical facts, this court has recently held that if the lien claimant contracts directly with the lessee, and the lessor knows of the construction and fails to file a notice of nonresponsibility, such claimant then has a ''direct contract with the owner'' for the purposes of section 1193. (*Halspar, Inc.* v. *La Barthe* (1965) 238 Cal.App.2d 897 [48 Cal.Rptr. 293], hearing denied by the Supreme Court, Feb. 16, 1966.)

■ During the course of construction, June through August of 1960, various ''extras'' were authorized by McLean and other agents of Millbrae. In each instance, John O'Hare, Benson's foreman, noted in his ''change or extras'' book the nature of the change and the man hours involved. The requested ''extras'' were installed.

Appellants contend there is no ''evidence showing the defendants, or any of them, ever agreed to pay'' for the ''extras.'' The court found that Millbrae had requested the ''extras'' and consequently held Millbrae personally liable for the judgment.

Appellants argue that respondents' effort to show McLean only an employee of Millbrae undermines their argument that McLean could legally bind Millbrae by his authorization. This cuts both ways: It is difficult to reconcile appellants' insistence that McLean was the general contractor with their equally as vigorous insistence that he had no right to authorize ''extras.''

Nonetheless, the question is one of fact; and there is sufficient evidence to support the court's finding that those who authorized the extras were proper agents of Millbrae. As for McLean, although only Millbrae's employee, the record shows Millbrae gave him full command over construction of the bowling alley. Moreover, McLean testified he made Masberg, Millbrae's admitted agent, aware of the extras when he approved them.

Appellants' most perplexing contention concerns what transpired after construction was completed. Specifically, how

did the court arrive at the figure $15,500 as the reasonable value of the "extras"? Unfortunately, from the standpoint of proof, respondents did not achieve the same clarity on this point as they did on other elements of their case.

King's Bowl opened to the public near the date on which the notice of completion was filed, September 8, 1960. On September 21, Benson sent its final billing to Millbrae. Therein Benson computed as follows: total materials and total labor used in the project were added together; to this was added 10 percent profit and overhead; and from the total thus determined was subtracted the fixed contract price, which left a balance due of $18,095.23, the alleged value of the extras. The bill of particulars showed $18,531.18.

Ultimately, a dispute arose and Millbrae refused to honor this billing. However, Masberg, McLean and O'Hare did meet to discuss the "extras."

As O'Hare discussed each of the notations in his "change or extras" book, which contained no dollar amounts, McLean and Masberg made a summary on a separate sheet. On this summary, then, they computed the total work performed by Benson ($55,365) and subtracted the fixed contract price ($38,000). McLean recommended that Masberg pay the difference ($17,365), which he admitted was the value of the "extras."

In fact, McLean attempted to secure a discount of $5,000, which he explained was a figure picked "out of the air." Some "question marks" appear on the summary sheet, and were inserted by Masberg when he objected to some of the extras. These items total about $1,800.

Delworth Shrader, secretary of Benson, testified that Masberg, at a later meeting, acknowledged "extras" worth $18,000, wishing to make a cash settlement of $14,000.

The fact on which appellants rely most heavily in arguing that the evidence is insufficient to sustain the amount of damages awarded is the admission of Shrader, who was responsible for all Benson's billings, that he could not segregate how much of the total labor and materials in the final billing were related to the original fixed contract price of $38,000 and how much related to alleged "extras."

If Benson had a *losing contract* for the work required under the fixed price contract, more could be recovered by totaling *all* of the work performed and subtracting the $38,000, the method employed in the final billing. This theory requires the assumption that some or all of the material and labor claimed

as "extras" was either not in fact performed or was used to fulfill obligations owing under the original contract. This seems to be the essence of appellants' objection.

However, the evidence sufficiently negates both these assumptions. In addition, the summary prepared by McLean and Masberg appears to be an accurate estimation of reasonable value, that is, $17,365 less the questioned $1,800, or a total of $15,565. This corresponds closely with the court's total award of $15,500.[3]

The court could accept this summary, give appellants credit for the items to which Masberg had objected, and round off this figure to yield the judgment amount. Since the record amply shows a figure of approximately $18,000 owing for "extras," there was sufficient evidence to support the disputed finding.[4]

■ When only one type of damage is alleged (here, the reasonable value of the "extras"), the court is entitled to make a lump sum judgment. The findings need not detail the computations used to arrive at the amount. (*Sessions* v. *Trott* (1934) 220 Cal. 714, 719 [32 P.2d 374]; *Foster* v. *Keating* (1953) 120 Cal.App.2d 435, 453 [261 P.2d 529]; *Klegman* v. *Moyer* (1928) 91 Cal.App. 333 [266 P. 1009].) Such itemization is only required if various items of damage are alleged and denied, thus each becoming a material fact. (*James* v. *Haley* (1931) 212 Cal. 142 [297 P. 920]; *Clements* v. *Lanning* (1949) 89 Cal.App.2d 817, 819 [202 P.2d 98]; *Wilcox* v. *Sway* (1945) 69 Cal.App.2d 560 [160 P.2d 154].)

■ The fact that the reviewing court cannot with absolute precision look at the evidence and, making the necessary manipulations, arrive at the exact figure used in the judgment should not be fatal. This is likewise true of a jury verdict. Of course, if under no reasonable interpretation of the record could the figure be supported, then there would be insufficient evidence to support the finding. For example, in *Sperisen* v. *Heynemann* (1957) 149 Cal.App.2d 228 [308 P.2d 436], the court reversed a judgment of $3,500 for further findings on

---

[3]The parties stipulated at trial that out of whatever amount Benson should recover, $10,965.95 was owing to General Electric Co., Benson's assignee.

[4]Although the amount of damages awarded appears in the conclusions of law, the $15,500 figure is in reality a finding of ultimate fact and may be considered as though included in the findings. (*29 Palms Van & Storage* v. *Los Angeles Met. Transit Authority* (1963) 221 Cal.App.2d 183, 185 [34 Cal.Rptr. 430]; *Wood* v. *Keller* (1945) 72 Cal.App.2d 14 [163 P.2d 904].)

damages, when the evidence showed the most loss that could have been suffered was $3,250.

█ Appellants would have had the trial court make a special finding on what portion of the work performed was actually required under the original fixed price contract. However, it is wholly immaterial whether or not the original contract was fully performed, so long as the findings that "extras" were installed and that their value was $15,000 are supported by the evidence.

Appellants argue that the judgment should be reversed because Benson failed to introduce the general ledger sheet for the Millbrae project, which would then have shown with more precision the nature of the "extras."

Benson explained that the records could not be found in the files of the accounting firm which had handled Benson's bookkeeping.

█ Even so, the distrust that is to arise when a normally expected document is not produced goes merely to the weight to be accorded other testimony. In view of the determinations of the trial judge, he evidently believed this other testimony as he had a right to do.

Finally, appellants contend that it was error for the trial court to allow Benson to amend his complaint to conform to proof.

The original complaint, the first amended complaint, and the second amended complaint on which the case went to trial all allege in substance a common count: That at the request of defendants materials and labor were furnished for the King's Bowl project; that their reasonable value was $18,395; that this sum was now due and unpaid; and that defendants refused to pay when requested. No mention is made of work done under an express contract.

At the close of the trial, the court considered Benson's motion to amend to conform to proof. This third amended complaint purports to allege three causes of action. The first and third, however, are both essentially the same as the common count previously alleged. The second count is for materials and labor furnished on an open book account.

Since the court did not find the existence of an open book account, there is no need to discuss the propriety of such a cause of action in relation to the evidence presented, or the possibility that this would be amending to state a new cause of action. If error, no prejudice resulted.

Since the second amended complaint alleged in substance

(and in almost identical wording) the common count set forth in the third amended complaint, accepted at the close of trial, the amendment to conform to proof is only *imaginary*.

Thus, the issue is reduced to whether a common count is the proper way to plead a cause of action for "extras" when no recovery is sought on the original fixed price contract. If this is error, then it matters little whether the error lurked in the complaint on which the parties went to trial or in the *allegedly* amended complaint.

Ever since *Castagnino* v. *Balletta* (1889) 82 Cal. 250 [23 P. 127], California has consistently held that, where an express contract is fully executed and nothing remains but the payment of money, it is proper to plead a common count, omitting any mention of the express contract. (See *Ferro* v. *Citizens Nat. Trust & Sav. Bank* (1955) 44 Cal.2d 401, 409 [282 P.2d 849]; *Emo* v. *Massae* (1962) 200 Cal.App.2d 473, 475 [19 Cal.Rptr. 652]; 5 Cal.Jur.2d, Assumpsit §§ 10, 11.) There is no reason to apply a different rule when the contract is partly express and partly implied.

However, in the instant case, Benson did not seek to recover the fixed contract price. That had been paid. Thus, the authorized "extras" are in effect a *separate implied contract* under which appellants must pay a reasonable price, since none was provided at the time the "extras" were installed. (*C. F. Bolster Co.* v. *J. C. Boespflug etc. Co.* (1959) 167 Cal.App.2d 143, 151 [334 P.2d 247]; *City Street Improv. Co.* v. *Kroh* (1910) 158 Cal. 308 [110 P. 933].)

Appellants' reliance on *O'Connor* v. *Dingley* (1864) 26 Cal. 11, is unavailing. In that case, a common count was improper because the performance due was something other than money. The *Castagnino* case distinguished it on this ground.

Appellants struggle to hold Benson to the fixed contract price, citing *Lemoge Electric* v. *County of San Mateo* (1956) 46 Cal.2d 659 [297 P.2d 638]. (See *Higgins* v. *Desert Braemar, Inc.* (1963) 219 Cal.App.2d 744, 751 [33 Cal.Rptr. 527].) They correctly state the rule that when a party pleads a common count and an express contract is shown, the *measure of damages* is the contract price, not reasonable value. However, it has no application to the present case since Benson sought only the value of the "extras" for which there was no underlying express contract.

Moreover, in the *City Street Improv. Co.* case, *supra*, cited by appellants, the court recognized that in a situation such as the one involved in the present case, the contract price is the

698

rule of payment for the work performed thereunder, while "for the extra labor, the party is entitled to his *quantum meruit.*" (*City Street Improv. Co.* v. *Kroh, supra,* 158 Cal. at p. 323.)

Judgment affirmed.

Shoemaker, P. J., and Taylor, J., concurred.