Filed 8/19/20  Silbermann v. Shangri-La Construction CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| WILLIAM JAMES SILBERMANN, Plaintiff and Respondent, v. SHANGRI-LA CONSTRUCTION, LP, Defendant and Appellant. | B290364 (Los Angeles County Super. Ct. No. BC622702) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rafael A. Ongkeko, Judge.  Affirmed in part; reversed in part; remanded with instructions.

Eisner and Sarah F. Powers; Collins Collins Muir + Stewart, Christian E. Bredeson and James C. Jardin for Defendant and Appellant.

Edward M. Picozzi, Ostergar Law Group and Treg A. Julander for Plaintiff and Respondent.

———————————

Construction contractor Shangri-La Construction, LP (Shangri-La) appeals the denial of its motion for judgment notwithstanding the verdict or, in the alternative, for a new trial after the trial court entered judgment on the jury's special verdict and awarded subcontractor William Silbermann, also known as Bill Silbermann Construction (Silbermann), $411,377 in damages for work performed for Shangri-La in the course of a building renovation.

Shangri-La contends the verdict must be set aside because the jury awarded Silbermann damages in quantum meruit for work that was governed by express contracts with Shangri-La for which Silbermann failed to obtain prior written authorization, as required by the contracts. Shangri-La also argues the jury's findings as to the reasonable value of Silbermann's work are not supported by substantial evidence, and its verdict awarding Silbermann amounts retained under the contracts was defective because the jury did not specify the amount of damages. Shangri-La contends further the trial court should have declared a mistrial after a juror looked up trial counsel on the Internet and then denied doing so when asked by the court. Finally, Shangri-La contends the court erred in awarding prejudgment interest, asserting Silbermann's damages were uncertain prior to the jury returning its verdict.

The trial court did not err in denying Shangri-La's motion for judgment notwithstanding the verdict or for a new trial. However, we agree with Shangri-La the court erred in awarding prejudgment interest. We reverse in part the award of prejudgment interest and remand to the trial court with instructions to recalculate prejudgment interest consistent with this opinion. In all other respects, we affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.    *The Contracts, Mechanic's Lien, and Complaint*

In 2015 the owners of a historic 13-story office building located at 416 West 8th Street in downtown Los Angeles hired Shangri-La as the general contractor to convert the building into a 226-room hotel (the Project).  Shangri-La in turn entered into contracts with Silberman to perform work on the Project.  Silbermann asserted Shangri-La failed to pay him the full amount owed under the contracts, and on May 6, 2016 Silbermann recorded a mechanic's lien against the property, claiming Shangri-La owed $497,191 in connection with "coring,[1] concrete cutting, concrete patching, [and] labor" Silbermann performed on the Project.

On June 8, 2016 Silbermann filed this action against Shangri-La and Fidelity and Deposit Company of Maryland (Fidelity),[2] the guarantor of the surety bond Shangri-La obtained to release the mechanic's lien, seeking to recover $497,191 in damages.  Silbermann asserted causes of action for breach of contract, quantum meruit, money had and received, goods and services rendered, and a claim to release the mechanic's lien.

---

[1]    Coring refers to drilling holes through concrete slabs to allow the installation of pipes.

[2]    Fidelity is not a party to this appeal.

B.    *The Evidence at Trial*

The trial court bifurcated trial of the action, with Silbermann's causes of action for breach of contract and quantum meruit tried to the jury first on November 6, 2017.[3]  The jury heard testimony from 11 witnesses over five days:  Silbermann and four of his employees and subcontractors; Shangri-La's chief executive officer and four of its site supervisors and foremen; and Shangri-La's expert on construction contracts and damages.

1.    *The coring contract and additional floor coring*

Following a competitive bid process, on December 23, 2015 Silbermann and Shangri-La entered into a contract for Silbermann to perform coring at the Project site (the coring contract).  The contract provided Shangri-La would pay $114,300 for the work.  The contract was printed on a Shangri-La form and was signed by Silbermann and Lynne Delameter, Shangri-La's vice president.  The contract specified Shangri-La would make periodic progress payments to Silbermann but would withhold 10 percent of the contract price as a "retainage" to be paid after completion of the Project, provided Silbermann's work was "fully, properly and timely performed in strict compliance with the requirements" of the contract.

---

[3]    Silbermann's cause of action relating to the mechanic's lien was tried before Judge Ongkeko on January 11, 2018.  The common counts causes of action for money had and received and goods and services rendered were dismissed before trial.

4

The coring contract defined the scope of work to include drilling 3,425 cores of varying diameters through concrete floors "based on 4″ thick slab" at locations marked out by Shangri-La on the Project plans. The scope of work also included sawing 518 larger rectangular cuts (also called openings) "based on 4″ thick slab" at designated locations.[4] In bidding on the contract, Silbermann calculated his bid, which became the contract price, based on the time it would take to drill each hole and the equipment that would be necessary to drill the requisite number of cuts through four inches of concrete. Fred Reyes, the Shangri-La senior project manager who solicited bids for the coring contract, confirmed the contract was based on drilling through four-inch thick concrete.

The coring contract provided as to modifications, "No employee or agent of [Shangri-La] is authorized to direct any changes in [Silbermann's w]ork by oral order except in an emergency affecting persons or property. Change to [Silbermann's w]ork and to this Agreement may be made only by a written directive or change order to this Agreement signed by [Shangri-La] ('Modification'). The Modification shall be on [Shangri-La] approved forms. [Silbermann], prior to the commencement of any revisions, shall submit promptly to [Shangri-La], in writing, a Claim for adjustment to the Subcontract Sum and Subcontract." Additional work "properly authorized by [Shangri-La]" would be paid "at direct field cost with a profit not to exceed 5%." Shangri-La was entitled unilaterally to make changes to the work to be performed by

---

[4] The larger rectangular openings were designed to enable installation of heating, air conditioning and ventilation ducts.

Silbermann, "whether minor or cardinal," consisting of "additions, deletions, reductions in scope, or other revisions," by issuing a modification, with the change to be compensated pursuant to other provisions of the contract.

When Silbermann and his crew began work on the Project, they discovered many of their four-inch cores were not penetrating the concrete floors, and they reported the issue to Shangri-La's on-site field superintendent (Bob Baca) and to Reyes. Reyes determined the cores were drilling into steel-reinforced structural beams and joists that were substantially thicker than four inches. Reyes orally informed the building owners, the architect, and the structural engineer of the problem. According to Silbermann, Baca instructed him to continue drilling as deep as necessary and to saw through rebar and use a jackhammer as necessary to penetrate the floors. Reyes acknowledged in his testimony many of the cores ultimately needed to be 16 to 18 inches deep to penetrate the floors, which "burned a lot of [drill] bits and took a long time." On January 8, 2016 Silbermann reported to Reyes that 475 of 498 holes he had drilled were 11 to 13½ inches deep, and all 200 rectangular cuts were 11 inches deep.

Silbermann considered this work to be outside the scope of the coring contract, and in early January 2016 he advised Shangri-La he would charge a significantly higher price per hole because of the additional time and tools necessary: $102.50 for cores exceeding four inches (compared to $27.50 per four-inch core under the contract) and $142.50 for rectangular cuts (compared to $42.50 per cut under the contract). Reyes testified Silbermann's rates for the additional work "were reasonable, so I agreed to them." Reyes considered the new terms to be a

"modification" of the coring contract. Reyes observed Silbermann performing pursuant to the modification to the benefit of the Project.

Silbermann testified he repeatedly went to Shangri-La's field office to request a change order on Shangri-La letterhead, but he was never provided with one. Silbermann testified he nonetheless proceeded with the work because Reyes and Richard Petersen, who in February 2016 replaced Reyes as senior project manager, signed the invoices Silbermann provided for work performed under the modified terms. Silbermann understood Reyes and Petersen to be the highest-ranking Shangri-La employees on-site, who were in charge of the entire Project, and Silbermann believed they were authorized to approve and direct the additional work. During the course of Silbermann's work from December 2015 through April 2016, no one from Shangri-La informed him that he would not be paid for the additional work because he had not used a Shangri-La change order. Multiple Shangri-La senior employees were on-site regularly and observed Silbermann's work, including Reyes, Petersen, site supervisor Darren Veith, and Shangri-La chief executive Andy Meyers.

Silbermann drilled 3,120 of the 3,425 cores and sawed 416 of the 518 rectangular cuts specified in the coring contract. At Shangri-La's direction, Silbermann did not complete the remaining cores and cuts because a portion of the site was occupied by business offices.[5] At trial, Silbermann claimed the reasonable value of the modifications to the contract was $355,680, accounting for the higher rates approved by Reyes and

---

[5] Silbermann agreed to credit Shangri-La for the uncompleted work based on the coring contract rates for the unfinished cores and cuts.

the number of cores and cuts exceeding four inches. Shangri-La paid Silbermann $102,870, based on the $114,300 original coring contract price, less the 10 percent retention Shangri-La withheld.

Shangri-La's project supervisor, Cody Holmes, testified Shangri-La withheld the retention because Silbermann had not submitted a claim on the industry-standard claim form and the overall Project was still being wound down, explaining "retention is held until substantial completion of the Project, and then the owner disperses all retentions to the subcontractors." In contrast, Silbermann testified he submitted multiple notarized requests on the proper form for paying the retained amount.

### 2. *Overhead and elevator pit coring*

On February 2, 2016 Petersen issued an urgent request on Shangri-La letterhead to the Project architect seeking design approval to drill cores through beams located along the walls on several floors of the building to accommodate sprinkler pipes. On March 17, 2016 Petersen forwarded the request to Silbermann with the handwritten instruction, "Bill – please proceed with coring for 2, 4, 8, 13 as needed for [the plumbing subcontractor]." Petersen also wrote, "Please core Fire Risers."

Silbermann and his employee David Garrison testified the requested work was distinct from the cores identified in the coring contract, and unlike the coring work, it involved "overhead coring," a more intensive process requiring hundred-pound drills to be bolted to horizontal walls. Silbermann and Petersen agreed to a price for the additional work, and Silbermann submitted periodic invoices that site superintendent John Paul Martinez signed. Silbermann believed Petersen had the authority to approve the additional work.

Shangri-La prepared a change order on Shangri-La letterhead dated April 15, 2016 reflecting the additional work, which also addressed a separate request for Silbermann to drill exploratory holes at the bottom of the elevator shaft to test the structure. The change order stated Silbermann would be paid $15,890 in addition to the coring contract, including $12,100 for 44 overhead cores at $275 each, $3,200 for 20 floor cores for the vertical fire risers, and $590 for coring in the elevator shaft. Shangri-La provided the change order to Silbermann after he completed the work. Although Silbermann signed the change order, Shangri-La did not. Silbermann testified the change order did not reflect all the overhead coring and elevator pit work he performed, claiming he should have been paid an additional $36,133 based on the rates described in the invoices Silbermann presented to Petersen.

### 3. *The grouting contract and additional floor patching*

On January 4, 2016 Silbermann and Shangri-La executed a contract for Silbermann to perform cast-in-place concrete repair for the Project, referred to as "grouting." Like the coring contract, the grouting contract was printed on a Shangri-La form and was signed by Delameter, and it included identical modification provisions requiring any additional work to be approved in writing on a Shangri-La form. The contract price was $259,328 with a 10 percent retainer. The scope of work was defined to include "[s]pall [r]epairs per plans" on "[c]olumns, [w]all, [s]tringer beams above each floor, and [s]offits."[6] The

---

[6] A "spall" is "[a] splinter or chip, especially of rock." (Oxford English Dict. Online (2020) https://en.oxforddictionaries.com/

contract provided the "[r]epair of any areas not identified on plans will be done on a [time and materials] basis, identified and signed for on a separate ticket."

Reyes testified Silbermann fully performed the grouting contract, and Shangri-La paid Silbermann the full contract price, less the 10 percent retention. Holmes testified Shangri-La did not release the retention on the grouting contract because Silbermann never submitted a bill on the proper claim form. In addition, the retention is not usually paid until there is "substantial completion" of the Project. Silbermann testified he submitted a claim for retention on the proper forms.

In January 2016 Shangri-La requested Silbermann provide a bid for additional work patching the concrete floors where walls and columns had been removed during the renovation, leaving depressions that needed to be filled and leveled prior to new construction. The project was urgent because the building owner was putting pressure on Shangri-La to begin construction of the new walls. Reyes and the site superintendent therefore orally instructed Silbermann to proceed. Reyes testified the floor patching project was for an "entirely different scope of work" outside of Silbermann's grouting contract.

On January 22, 2016 Silbermann faxed a letter to Reyes with the subject "Floor patching contract," which stated, "After submitting a written proposal to do the floor patching where previous walls have been removed from floors 2-12 . . . for the

definition/spall [as of August 18, 2020].) A "soffit" is "[t]he underside of an architectural structure such as an arch, a balcony, or overhanging eaves." (Oxford English Dict. Online (2020) https://en.oxforddictionaries.com/definition/soffit [as of August 18, 2020].)

10

price of $129,750.00, we were verbally ordered to proceed. I have yet to receive a contract from your company, . . . We will start prep immediately today upon your WRITTEN APPROVAL, and start the actual patching Monday. If you approve please sign below and we will start immediately." Reyes signed the letter, checking the response stating, "I approve the proposal and order you to proceed per these terms and prices (Contract to follow from office)." Reyes also handwrote, "OK per Lynne Delameter." At trial, Reyes affirmed he had received Delameter's authorization to approve Silbermann's proposal.

Silbermann performed the floor patching contemplated by the letter agreement. Silbermann repeatedly requested Shangri-La generate a contract for the floor patching project, but Shangri-La never did. Although Silbermann repeatedly requested payment and was told payment "was in the works," he was never paid.

4.     *Debris removal and floor protection*

When Silbermann first arrived on the Project site in December 2015, he encountered large piles of debris from previous demolition work throughout the building, including broken concrete, bricks, lumber, door frames, windows, and glass. Because the debris covered the floors and prevented Silbermann from drilling, Reyes requested Silbermann have his crew remove the debris on a "time and materials" basis pursuant to Silbermann's standard labor rate sheet. A crew of 10 laborers worked continuously from approximately December through January 2016, laying Masonite boards on marble floor surfaces for protection and using wheelbarrows and shovels to carry the debris down the elevators to a dumpster.

11

Silbermann testified the cost of the cleanup project on a time and materials basis at his standard labor rates was $26,500. During the cleanup, Silbermann prepared daily invoices identifying the number of workers and the total labor expense for the day. Reyes observed the cleanup and approved Silbermann's invoices. Silbermann submitted the signed invoices to Shangri-La's billing department, but he was never paid. Silbermann and Reyes testified the removal of other subcontractors' debris was not part of the coring and grouting contracts. Silbermann testified none of the time and materials he charged included cleanup of debris generated by Silbermann's own crew, which he admitted was within the within the scope of his contracts with Shangri-La.

C.    *The Special Verdict and Judgment*

On November 15, 2017 the jury returned a special verdict, making findings on Silbermann's claims organized into six parts: (I) retention on the coring contract; (II) retention on the grouting contract; (III) additional [floor] coring; (IV) overhead and elevator pit coring; (V) floor patching; and (VI) cleanup/laying Masonite. The jury found as to the coring and grouting contracts (parts I and II) Silbermann had done "all, or substantially all, of the significant things that the contract required [him] to do in order to recover the retention[s]" and "[Shangri-La] is required to pay the retention[s] under the contract now." However, the special verdict form did not ask the jury to make findings as to the dollar amount of the retention, and the jury made no such findings.

12

As to Silbermann's claims with respect to the "additional [floor] coring" (part III); "overhead and elevator pit coring" (part IV); "floor patching" (part V); and "clean-up/laying Masonite" (part VI), the jury found (1) there was no "valid, written contract governing the subject matter for which [Silbermann] now seeks recovery"; (2) Shangri-La "request[ed], by words or conduct, that [Silbermann] perform services for the benefit of [Shangri-La], the subject matter of which is not governed by any written contract between the parties"; (3) Silbermann did not "know or have reason to believe that Fred Reyes could not authorize the claimed additional work"; (4) Silbermann "[d]id the work for which he now seeks to recover"; and (5) Silbermann has "proven the reasonable value of his work." The jury also found the quantum meruit value of Silbermann's additional work separate from the two contracts was $313,701, including $158,818 for additional coring; $36,133 for overhead coring and elevator pit work; $99,750 for floor patching; and $19,000 for cleanup/Masonite.

On March 2, 2018 the trial court entered judgment on the jury's special verdict and awarded Silbermann $411,376.91. The award included the amounts determined by the jury to be the reasonable value of Silbermann's work, as found in parts III through VI of the verdict form, plus $25,932.80 for retention under the grouting contract (10 percent of $259,328) and $11,430 for retention under the coring contract (10 percent of $114,300). The award also included $60,313.11 in prejudgment interest calculated at 10 percent per annum beginning on May 6, 2016, the date Silbermann filed the mechanic's lien. The court only awarded prejudgment interest on the work set forth in parts I through V, not the $19,000 awarded in part VI for debris

13

removal. The trial court handwrote the calculations for retention and prejudgment interest on the judgment.

On March 29, 2018 Shangri-La and Fidelity filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial. The trial court denied the motions on April 30, 2018. As to the motion for judgment notwithstanding the verdict, the court found "there was substantial evidence, or reasonable inferences to be drawn therefrom, on all grounds raised in the motion to support the challenged verdicts." As to the motion for new trial, the court ruled, "After weighing all of the evidence, the court finds that there was sufficient evidence to show that [Silbermann's] additional work as relevant to his claims in Parts III-VI of the special verdict was not governed by either agreement and, therefore, quantum meruit recovery was properly submitted to the jury. The testimony of [Silbermann] and Fred Reyes was credible, reasonable, and solid in all significant respects. The jury apparently rejected, and the court also finds, that there was no evidence of a collusion or conspiracy between them, notwithstanding [Shangri-La's] innuendos. . . . The court cannot say that the jury clearly should have reached different verdicts."

Shangri-La timely appealed.

## DISCUSSION

A. *Standard of Review*

"'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.'" (*Cabral v. Ralphs Grocery*

14

*Co.* (2011) 51 Cal.4th 764, 770; accord, *Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 313 (*Johnson*).) "'"On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citations.] If there is, we must affirm the denial of the motion."'" (*Newland v. County of Los Angeles* (2018) 24 Cal.App.5th 676, 684; accord, *Cabral*, at p. 770; see *IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 639 [denial of a motion for judgment notwithstanding the verdict "is essentially the same as appealing the judgment itself for a lack of substantial evidence"].) The appellate court, like the trial court, may not reweigh the evidence or judge the credibility of witnesses. (*Johnson*, at p. 313.) "'"'"If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied."'"'" (*Ibid.*, quoting *Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110.)

"The denial of a new trial motion is reviewed for an abuse of discretion, except that a trial court's factual determinations are reviewed under the substantial evidence test." (*Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 514, fn. 7; see *People v. Johnson* (2019) 8 Cal.5th 475, 524 ["We will not disturb a trial court's denial of a motion for a new trial unless 'a "manifest and unmistakable abuse of discretion"' clearly appears."].) Code of Civil Procedure section 657 provides seven grounds for granting a new trial where the error "materially affect[s] the substantial rights" of a party, including as applicable here: "[¶] 2. Misconduct of the jury; . . . [¶] . . . [¶] . . . [¶] 5. Excessive or inadequate damages. [¶] 6. Insufficiency of the evidence to justify the verdict or other decision, or the verdict or other

decision is against law.  [and]  [¶]  7. Error in law, occurring at the trial and excepted to by the party making the application." However, "[a] new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict . . . unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."  (Code Civ. Proc., § 657.)

B.  *The Jury's Findings Awarding Silbermann Damages in Quantum Meruit Are Supported by Substantial Evidence*

Shangri-La contends Silbermann was not entitled to recover damages in quantum meruit because his contracts with Shangri-La governed his performance, and to the extent he performed additional work without obtaining written change orders, he was not entitled to compensation.  Shangri-La's contentions lack merit.[7]

---

[7]  Although the parties correctly articulate the differing standards of review for a motion for judgment notwithstanding the verdict and a motion for a new trial, they do not distinguish between the motions in their arguments.  Because substantial evidence supports the verdicts, the trial court properly denied both motions to the extent they relied on the sufficiency of the evidence.  The trial court likewise did not abuse its discretion in denying Shangri-La's motion for a new trial on the basis of an error of law.

16

1. *Substantial evidence supports Silbermann's quantum meruit claims based on work performed outside the scope of the parties' contracts*

"'A quantum meruit or quasi-contractual recovery rests upon the equitable theory that a contract to pay for services rendered is implied by law for reasons of justice. [Citation.] However, it is well settled that there is no equitable basis for an implied-in-law promise to pay reasonable value when the parties have an actual agreement covering compensation.'" (*Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism* (2016) 6 Cal.App.5th 1207, 1222 [quantum meruit claim for costs of prosecuting unlawful detainer action barred where defendants had contractual obligation to pay the costs, but plaintiffs could plead alternative inconsistent causes of action], affd. on other grounds (2018) 4 Cal.5th 637; accord, *California Medical Assn. v. Aetna U.S. Healthcare of California, Inc*. (2001) 94 Cal.App.4th 151, 172 [medical association could not maintain claim on behalf of doctors against insurance companies for compensation under quasi-contract theory where parties' rights were defined by express binding agreements]; see *Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1179 ['"Implied contractual terms "ordinarily stand on equal footing with express terms"' [citation], provided that, 'as a general matter, implied terms should never be read to vary express terms.'"].)

However, "[i]n cases where extra work is caused by authorized deviations from a building contract, and no agreement is made regarding the price thereof, or payment therefor, the law implies an agreement by the owner to pay the reasonable value of the extra work." (*City Street Improv. Co. v. Kroh* (1910) 158 Cal.

17

308, 323 (*City Street Improv.*), overruled in part on other grounds by *Pasadena v. Charleville* (1932) 215 Cal. 384; accord, *Benson Electric Co. v. Hale Bros. Associates, Inc.* (1966) 246 Cal.App.2d 686, 697 (*Benson*) [general rule barring equitable remedies when a written contract controls does not apply where contractor seeks value of "'extras' for which there was no underlying express contract"].)  "Extra work as used in connection with a building contract means work arising outside of and entirely independent of the contract—something not required in its performance, not contemplated by the parties, and not controlled by the contract. [Citations.] . . .  Where the extras are of a different character from the work called for in the contract and no price is agreed on for extra work, their reasonable value may be recovered." (*C. F. Bolster Co. v. J. C. Boespflug Constr. Co.* (1959) 167 Cal.App.2d 143, 151 (*Bolster Co.*).)

The Supreme Court's holding in *City Street Improv., supra*, 158 Cal. 308 is directly on point.  There, the county entered into a contract with the plaintiff to perform road improvements in the course of which the county's plan for the work was modified to decrease the amount of grading required for the project.  (*Id.* at pp. 314, 325.)  The Supreme Court concluded that because the contract did not specify the price to be paid based on the modified amount of grading required, "it would be necessary to resort to the general principles of the law of implied contracts." (*Id.* at p. 325.)  Similarly, in *Bolster Co., supra*, 167 Cal.App.2d at page 145, the plaintiff entered into a subcontract to apply plastering to a school building, but in the course of the work the condition of the building's exterior surface required the plaintiff to apply three coats of plaster, instead of the two required under the subcontract.  The Court of Appeal concluded there was

18

substantial evidence the third coat of plaster was necessary to produce an exterior wall surface that conformed to the specifications of the contract and the general contractor directed the third coat be applied. (*Id*. at pp. 150-151.) Accordingly, the plaintiff was entitled to recover for the reasonable value of the third coat of plaster, which was not controlled by the contract or contemplated by the parties. (*Id*. at p. 151.)

Here, the jury made specific findings as to each quantum meruit claim that there was no "valid, written contract governing the subject matter for which [Silbermann] now seeks recovery." The jury also found Shangri-La instructed Silbermann to perform additional work "the subject matter of which [are] not governed by any written contract between the parties." These findings are supported by substantial evidence.

With respect to the additional floor coring (part III), the coring contract expressly stated the cores and cuts were "based on a 4″ thick slab," but Silbermann and Shangri-La learned in January 2016 that approximately 95 percent of the cores and cuts needed to be at least 11 inches deep and required sawing through steel-reinforced structural beams and blasting out holes with jackhammers. Silbermann priced his bid for the coring contract based on the time and resources it would take to penetrate four-inch concrete slabs, not concrete and metal to depths of 11 inches or more. In addition, Baca instructed Silbermann to drill as deeply as necessary to saw through the rebar and penetrate the floors. Multiple Shangri-La senior employees observed the modified work. Silbermann advised Reyes of the modified rates he would charge to drill the deeper holes, and Reyes "agreed to them." Likewise, Reyes and Petersen signed the invoices submitted by Silbermann with the modified prices.

19

With respect to the overhead and elevator pit coring (part IV), the coring contract identified 3,425 cores and 518 rectangular cuts to be drilled based on the Project plans. But several months later Petersen instructed Silbermann to perform overhead and elevator pit coring based on subsequent design revisions. The additional work was distinct from the coring called for under the coring contract in that the overhead and elevator pit coring involved the bolting of drilling machinery to walls and lowering men and equipment into an elevator shaft instead of coring through the concrete floor. Petersen agreed to Silbermann's price for the additional work, and Shangri-La prepared a written change order for the additional work, which Silbermann signed but Shangri-La did not.

The floor-patching work (part V) also falls outside of the scope of the contracts. To support its argument the floor patching was part of the grouting contract, Shangri-La points to testimony from Silbermann employee Thomas Ocon that he used "grout mix" to do "floor patching" and from Silbermann subcontractor Marvin Aceves that "[g]rout [and] patch are interchangeable [terms]. . . . It's basically the same thing as . . . for the ceiling." But regardless of the common nature of the work, the grouting contract clearly defined the scope of the work to include "[s]pall [r]epairs per plans" on "[c]olumns, [w]all, [and] [s]tringer beams above each floor, and [s]offits," that is, grouting on walls and ceilings, which is distinct from the additional floor patching work to fill in and level depressions in the floors. Reyes admitted the floor patching work was an "entirely different scope of work" that would require a new contract. Further, Silbermann provided a written proposal for the floor patching work to Reyes at the request of Shangri-La, which proposal Reyes signed, checking the

20

box "I approve the proposal and order you to proceed per these terms and prices."

With respect to Silbermann's site clean-up and laying of Masonite floor protection (part VI), the parties' contracts did not address removal of demolition debris left by other subcontractors, and Silbermann and Reyes testified the debris littered the Project site when Silbermann first arrived. Further, it was Reyes who requested Silbermann remove the debris on a "time and materials" basis; Reyes observed the cleanup, and Reyes approved Silbermann's invoices for the work. On appeal, Shangri-La disputes that Silbermann performed the cleanup work, but it does not argue the work fell within the scope of the contracts.

Thus, substantial evidence supports recovery in quantum meruit with respect to each of these categories of additional work because the work was of a different character from the work called for in the contracts, the coring contract did not provide a price for the modified coring work, the modified work was not contemplated by the parties, and Shangri-La directed it be performed. (*City Street Improv., supra*, 158 Cal. 308 at p. 323; *Bolster Co., supra*, 167 Cal.App.2d at 151.)

The cases relied on by Shangri-La are distinguishable because in each case the parties had an express agreement covering the work for which the plaintiff sought equitable relief, thus barring relief for both an express and implied contract. As noted in *California Medical Assn. v. Aetna U.S. Healthcare of California, Inc., supra*, 94 Cal.App.4th at pages 172 to 173, an express contract governed the doctors' right to compensation from the insurance companies. In *Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1420, an

express contract governed the plaintiff consultants' right to commissions from the defendant securities company. In *Wal-Noon Corp. v. Hill* (1975) 45 Cal.App.3d 605, 613, a written lease governed the obligation of the lessor to make roof repairs. In contrast to these cases, the jury here awarded damages for additional work not specified by the written contracts.

2.     *Shangri-La waived the requirement Silbermann obtain a written change order for additional work*

Shangri-La contends Silbermann's recovery in quantum meruit was barred by the express terms of the contracts that required Silbermann to obtain a written change order on an approved claim form to recover for additional work performed. However, substantial evidence supports a finding Shangri-La waived the written change order requirement.[8]

---

[8]     Shangri-La's argument is premised on its assertion the contracts "expressly provide that [Silbermann] is not entitled to payment in the event he does not follow the procedure set forth therein" for change orders. (Italics omitted.) Although the coring and grouting contracts require any modification be made by a written change order, only the prime contract between the Project owner and Shangri-La provides specifically that failure to obtain a change order "shall be deemed a waiver of [Shangri-La's] and [Silbermann's] right to payment for such work." The contracts between Shangri-La and Silbermann include the prime contract within the definition of a "subcontract document," but the prime contract does not purport to control the payment arrangement between Shangri-La and Silbermann. In any event, there is substantial evidence Shangri-La waived the change order requirement.

"If the parties, by their conduct, clearly assent to a change or addition to the contractor's required performance, a written 'change order' requirement may be waived." (*Weeshoff Constr. Co. v. Los Angeles County Flood Control Dist.* (1979) 88 Cal.App.3d 579, 589 (*Weeshoff*); accord, *Healy v. Brewster* (1967) 251 Cal.App.2d 541, 552 ["Where the terms of a written contract require that extra work be approved in writing, such provision may be altered or waived by an executed oral modification of the contract."]; *Howard J. White, Inc. v. Varian Associates* (1960) 178 Cal.App.2d 348, 353 ["It is settled law that the parties may by their conduct waive the requirement of a written contract that no extra work shall be done except upon written order."]; *Bolster Co., supra*, 167 Cal.App.2d at p. 153.)

*Weeshoff, supra*, 88 Cal.App.3d at pages 585 to 586 and *Bolster Co., supra*, 167 Cal.App.2d 143 are directly on point. In *Weeshoff*, a flood control district entered into a contract with a contractor to construct a storm drain project. The contract required the contractor to maintain three lanes of traffic on a specified road during construction but prohibited the use of temporary pavement during construction. (*Weeshoff*, at p. 583.) After the district pressured the contractor to use temporary pavement to enable the opening of the traffic lanes, the district refused to approve a change order or pay the contractor for the work. The Court of Appeal affirmed a judgment awarding the contractor the value of the additional paving, concluding there was substantial evidence the defendant intended to waive the written change order requirement by directing the contractor to restore the traffic lanes knowing temporary pavement was needed and itself using temporary pavement on a portion of the

23

same road to restore traffic.  (*Id.* at pp. 589-590.)[9]  Similarly, in *Bolster Co.* the Court of Appeal rejected the defendant's argument the plastering subcontractor was barred from recovering the cost of applying a third coat of plaster by its failure to obtain a written change order.  (*Bolster Co., supra*, 167 Cal.App.2d at pp. 152-153.)  The court concluded sufficient evidence supported a finding of waiver because "the extra work was done at defendant's special instance and request," noting the contractor had submitted a written offer to perform the additional work, and defendant directed the contractor to proceed without referring to the need to comply with the written change order requirement.  (*Id.* at pp. 152-153.)

---

[9]  The holding in *Weeshoff, supra*, 88 Cal.App.3d 579 has been criticized for applying the law that a private contracting party may waive the requirement of a written change order to contracts with public agencies subject to public contracting law.  (See *P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1342 [noting questionable continued viability of *Weeshoff*, explaining "the party contracting with a public agency is charged with the knowledge of public contracting law"]; *Katsura v. City of San Buenaventura* (2007) 155 Cal.App.4th 104, 111 [*Weeshoff* improperly "cited cases involving private parties, not public agencies" to hold a change order requirement may by waived by the parties' conduct]; see also *G. Voskanian Construction, Inc. v. Alhambra Unified School Dist.* (2012) 204 Cal.App.4th 981, 989 [the requirement in a public contract that change orders must be in writing cannot be waived].)  None of these cases questions the validity of a waiver of the requirement for a written modification in a private construction contract.

24

Here too, there was substantial evidence multiple Shangri-La employees supervised the additional work; senior employees orally approved additional payment for the work; and in some instances Shangri-La instructed Silbermann to proceed with the work after Silbermann requested written approval.[10] Shangri-La, by both words and conduct, thereby waived the written change order requirement in the parties' contracts.

C.    *Substantial Evidence Supports Silbermann's Recovery of Damages for Retention Under the Contracts*

The jury found on Silbermann's breach of contract claims Shangri-La was "required to pay the retention under the contract[s] now," but it did not assign a specific dollar amount. Shangri-La contends the failure of the jury to specify an amount of the retentions violated Code of Civil Procedure section 626's

---

[10]    At trial, Shangri-La sought to discredit Reyes's testimony and to suggest Reyes conspired with Silbermann to bilk the company for the additional work. On appeal Shangri-La continues to discount the value of Reyes's testimony as substantial evidence supporting the verdict. However, the trial court in its ruling denying the motions for judgment notwithstanding the verdict and for new trial found Reyes was "credible, reasonable, and solid in all significant respects." On appeal we may not reweigh the evidence or judge the credibility of witnesses. (*Johnson, supra*, 37 Cal.App.5th at p. 313.) Further, there was substantial evidence other Shangri-La employees, including Petersen, Delameter, the architect, and Shangri-La foremen, were aware of Silbermann's work on the site but allowed it to proceed.

requirement the jury "find the amount of the recovery."[11] Shangri-La also argues insufficient evidence was presented at trial to support the court's determination Shangri-La owed Silbermann $11,430 on the coring contract and $25,932.80 on the grouting contract (10% of the contract sums of $114,300 and $259,328, respectively). Neither contention has merit.

The special verdict form prompted the jury to state as to the coring and grouting contracts whether Silbermann was entitled to retention under the contract, but it provided no place on the form for the jury to specify the value of the retention. At the final hearing on the verdict form on November 14, 2017, Shangri-La's attorney did not object to parts I and II of the verdict form addressing Silbermann's claims to recover retention under the contracts (on pp. 2-3 of the verdict form). Shangri-La's attorney stated, "I think that we've come to an agreement on pages 2 and 3." Silbermann's attorney agreed. The court then stated, "So there's no amounts. That's fine." Silbermann's attorney commented, "[W]e'll figure that out on your own." The court responded, "I think the jury will appreciate that."

This colloquy among counsel and the court reflects an implied agreement by counsel that the jury would determine whether Shangri-La owed Silbermann retention under the contracts, and the court would subsequently calculate the amount owed. Shangri-La's alternative scenario is not reasonable—that the parties would focus extensively on retention at trial and include retention in the jury verdict, but if Silbermann prevailed on his retention claims, he would recover nothing. Shangri-La's

---

[11] Code of Civil Procedure section 626 provides, "When a verdict is found for the plaintiff in an action for the recovery of money, . . . the jury must also find the amount of the recovery."

assertion the jury could have included retention as part of the damages awarded on the quantum meruit claims is inconsistent with the verdict form, which makes clear retention was part of the breach of contract claims, not the quantum meruit claims.

In addition, because Shangri-La agreed to the verdict form before it was submitted to the jury and failed to request clarification as to how the retention amount would be calculated before the jury was discharged, Shangri-La forfeited any objection to the failure of the verdict form to specify a dollar amount of retention. (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 263-264, italics omitted ["'Failure to object to a verdict before the discharge of a jury and to request clarification or further deliberation precludes a party from later questioning the validity of that verdict if the alleged defect was apparent at the time the verdict was rendered and could have been corrected.'"]; *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1242 ["'The obvious purpose for requiring an objection to a defective verdict before a jury is discharged is to provide it an opportunity to cure the defect by further deliberation.'"].)

Even had Shangri-La not forfeited its challenge to the trial court's calculation of retention, the court did not violate section 626 because the jury was not asked to resolve a factual dispute concerning the amount of the retention beyond Shangri-La's obligation to pay it. (See *Redmond v. Weismann* (1888) 77 Cal. 423, 425-426 [in a builder's action to recover damages for construction work, where the jury was instructed without objection that it should determine whether the parties entered a contract but not the amount of damages, the jury's verdict "for the plaintiff" was sufficient to support a judgment for the contract sum and did not warrant reversal under § 626];

27

*Pray v. Trower Lumber Co.* (1929) 101 Cal.App. 482, 490-491 [jury verdict specifying money damages for unpaid deliveries that stated defendant could deduct transportation charges "as shown by . . . expense bills" did not violate § 626 where the trial court later modified the judgment to deduct the undisputed transportation charges because "the verdict therefore was decisive of the only issue presented for the jury's determination"].)

It is true no witness testified to the numerical value of the retention under the contracts, but there was substantial evidence fixing the value.  The cover page of the coring and grouting contracts stated the total contract price ($114,300 and $259,328, respectively) and noted, "10% retainage withheld."  Silbermann explained "[a] retention is 10 percent of the value of the contract that is withheld until you are a hundred percent complete with your project."  Reyes similarly testified subcontractors were paid for the billed contract price, "less 10 percent retention," until completion of the Project.  Thus, substantial evidence supports the award of the retention amounts.

D.      *Substantial Evidence Supports the Jury's Valuation of Silbermann's Quantum Meruit Claims*

Shangri-La contends the jury's award on Silbermann's quantum meruit claims was not supported by substantial evidence.  We conclude otherwise.

"The measure of recovery in quantum meruit is the reasonable value of the services, provided they were of direct benefit to the defendant."  (*Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1274; accord, *Maglica v. Maglica* (1998) 66 Cal.App.4th

28

442, 449.)  "The burden is on the person making the quantum meruit claim to show the value of the services." (*Children's Hospital*, at p. 1274; accord, *Miller v. Campbell, Warburton, Fitzsimmons, Smith, Mendel & Pastore* (2008) 162 Cal.App.4th 1331, 1344.)  "The 'reasonable value' of the services has been described as the 'going rate' for the services [citation] or the 'reasonable market value at the current market prices.'" (*Children's Hospital*, at p. 1274; accord, *Punton v. Sapp Bros. Constr. Co.* (1956) 143 Cal.App.2d 696, 701.)  "[T]he party suing for compensation may testify as to the value of his services . . . . [Citation.]  Evidence of value can also be shown through agreements to pay and accept a particular price.  [Citations.]  'The court may consider the price agreed upon by the parties "as a criterion in ascertaining the reasonable value of services performed."'  [Citation.]  . . . Additionally, evidence of a professional's customary charges and earnings is relevant and admissible to demonstrate the value of the services rendered." (*Children's Hospital*, at pp. 1274-1275.)  Moreover, "in the absence of evidence of the value of such services, or where the evidence leaves uncertain the amount plaintiff is entitled to recover, the jury may estimate their value from their own judgment and knowledge on the subject." (*Punton*, at pp. 701-702; accord, *Burgermeister v. Wells Fargo Bank & Union Trust Co.* (1961) 191 Cal.App.2d 624, 632.)

Substantial evidence supports the jury's valuation of Silbermann's additional work.  With respect to the additional floor coring, Silbermann advised Reyes of the rates he would charge per opening, and Reyes testified the rates "were reasonable, so I agreed."  With respect to the overhead and elevator pit coring, Shangri-La drafted a change order specifically

pricing the work. For the floor patching, Reyes and Silbermann similarly agreed in writing on a project price, and Reyes testified Delameter authorized the work. As to the debris removal, Reyes agreed to pay Silbermann on a time and materials basis based on his standard labor rate sheet. Reyes and Silbermann testified Silbermann carried out the additional work in each of these categories. In addition, Garrison, Aceves, and Ocon described their performance of the additional work and authenticated photographs showing the work in progress.

Shangri-La's challenges to the sufficiency of this evidence are not persuasive. First, as noted, Shangri-La questions Reyes's credibility but fails to point to evidence that calls Reyes's testimony into question. As discussed, the trial court found Reyes credible, and we do not assess the credibility of witnesses on appeal. (*Johnson*, *supra*, 37 Cal.App.5th at p. 313.) Second, Shangri-La points out Silbermann failed to produce time cards for his employees' work or documentary proof he paid Aceves for Aceves's floor patching work, instead relying only on the testimony of Silbermann and his workers.[12] But "[t]he testimony of a single witness is sufficient proof of any fact." (*Brand v.*

---

[12] Shangri-La also claims Silbermann falsified invoices for his overhead coring, citing testimony from Shangri-La superintendent John Paul Martinez that he signed off on some of Silbermann's daily work tickets to certify the work had been performed, but Silbermann filled in a dollar amount later. However, Martinez's testimony was only relied on to show Silbermann performed the additional work to Shangri-La's satisfaction. To support his money claims, Silbermann relied on the draft change order Shangri-La issued and Petersen's agreement the change order would govern the overhead and elevator pit coring work.

30

*Hyundai Motor America* (2014) 226 Cal.App.4th 1538, 1550; see Evid. Code, § 411 ["the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact"].) Moreover, several witnesses, none of whom currently works for Silbermann, testified to their completion of the work.

Third, Shangri-La contends the jury was misled into awarding a double recovery, awarding the same damages in quantum meruit and under the contracts. For example, to support its argument the jury awarded damages in quantum meruit for work performed under the grouting contract, Shangri-La cites Aceves's testimony that floor patching is "basically the same thing, as in like for the ceiling." But as discussed, this ignores the substantial evidence the scope of work defined in the grouting contract and floor patching project did not overlap.[13] As another example, Shangri-La cites to Garrison's testimony the overhead coring work he performed matches the work described in the April 2016 unsigned change order for $15,890 "that became part of [the coring contract]." But Shangri-La never paid the $15,890 specified in the change order, so this amount never became part of the coring contract.

Fourth, Shangri-La contends the jury was misled by Silbermann's closing argument into awarding the value of the retention on the coring contract twice, once as contract damages in part I and a second time as a part of the quantum meruit award for additional coring in part IV. Shangri-La is correct

---

[13] Likewise, contrary to Shangri-La's argument, Aceves's testimony that one of the grouting materials used to patch floors is the same type of grouting material called for under the grouting contract does not prove Silbermann billed Shangri-La for materials he used for the grouting contract.

Silbermann's counsel in his closing argument asserted $309,835 was the reasonable value of Silbermann's additional coring work, which "includes the retention on the contract." But Shangri-La's attorney did not object to the closing argument at any time before the jury delivered its verdict, thereby forfeiting its challenge to the verdict on this basis. (See *Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 200 ["By remaining silent during plaintiffs' counsel's zealous closing argument, [defendant] forfeited any right to challenge the remarks as improper or inflammatory at this juncture."]; *Saret-Cook v. Gilbert, Kelly, Crowley & Jennett* (1999) 74 Cal.App.4th 1211, 1230 ["[Defendant] complains that the closing argument made by the individual respondent's counsel 'blatantly encouraged the jury to award damages based on their dislike of [defendant], rather than on [plaintiff's] emotional distress damages.' However, [Defendant] does not cite to anywhere in the record where she objected to this argument in the trial court, or asked for an admonishment or a curative instruction. The point is therefore waived."].)

Even if Shangri-La did not forfeit this argument, it has not shown the jury awarded the $11,400 retention amount on the coring contract twice. Silberman's attorney later in his argument specifically requested 10 percent of the contract price for the coring contract, which he pointed out was the amount Shangri-La owed on part I of the verdict form. Silbermann's attorney stated part I of the verdict form "pertains to [the coring] contract and no other contract—nor quantum meruit." Further, the jury rejected

Silbermann's request for $309,835 in quantum meruit for additional coring, instead awarding only $158,818.[14]

### E.    *Juror Misconduct Did Not Require a New Trial*

Shangri-La contends the trial court erred in denying its motion for a new trial because a juror engaged in prejudicial misconduct by researching trial counsel on the Internet and lying about it when questioned by the trial judge.  We agree with the trial court there was insufficient evidence of prejudice to Shangri-La to warrant a new trial.

#### 1.    *Evidence of juror misconduct*

Halfway through trial, Juror No. 13 (Mr. Smith) informed the trial court he saw Juror No. 12 (Ms. Gonzalez) using her smart phone during trial to look up Silbermann's lead trial counsel, James Turken.  The court called Smith into the courtroom outside the presence of the other jurors and asked him what he saw.  Smith responded as to Gonzalez, "This morning she's had her phone on the whole time.  She holds it down low and she's leaning into me, and she's got Mr. Turken—I don't know what Web site she was looking at, but his picture is there, his name is there, and she's researching him. . . .  Instead of listening to the witness, she was researching."  The trial court

---

[14]    Shangri-La also argues as evidence of an improper recovery that on the eve of trial Silbermann abandoned his claim for nearly $100,000 in "unpaid overtime," then arbitrarily increased his quantum meruit claim by more than $100,000.  Whether Silbermann changed his theory of recovery before trial is irrelevant to the soundness of the jury's finding as to the reasonable value of Silbermann's work based on the evidence at trial.

next called Gonzalez into the courtroom and asked if she was "possibly . . . violating an order of the court by being on the Internet." Gonzalez responded, "Oh, because I'm texting my boss, if I could not come to work tonight because I'm here at jury duty. . . . But I'm listening, you know. I'm sorry." Asked again if she was "on the Internet of any kind, looking for anything," Gonzalez answered, "No." But Gonzalez added she also texted with her daughter about plans that afternoon. The court asked if "that's it," and Gonzalez answered "yeah, definitely."

Shangri-La asked the court to dismiss Gonzalez for her misconduct, acknowledging this would result in a mistrial because there were no alternate jurors. The court asked Turken what Internet pages featured his photograph that Gonzalez might have seen. Turken stated there were multiple photographs of him on his law firm's Web site, and the Web site also included information about his other cases, including one in which Turken represented a group affiliated with the Israel Defense Forces in a lawsuit against a hotel in Santa Monica coincidentally named the Shangri-La. Silbermann's counsel objected to dismissing Gonzalez, arguing there was no evidence Gonzalez saw any material about Turken's other matters and a mistrial would impose unfair economic hardship on Silbermann. After hearing argument, the court called Gonzalez back into the courtroom for further questioning.

Asked again whether she used the Internet during trial, Gonzalez replied, "Oh, yeah. I did Google . . . 'cause I wanted to know . . . the names of the lawyers and all that stuff." Gonzalez stated she did not admit this to the court when first questioned "because . . . it doesn't really make a big deal for me. I just want to know their names and all that stuff. . . . For me it was just an

innocent thing or something.  I don't do any malice against you."
Gonzalez stated she tried looking up all the lawyers in the case
but could not find Silbermann's lawyer, Edward Picozzi, because
she did not know how to spell his name.  When she searched for
other lawyers, she "couldn't get their names" and was only able to
obtain something on "Lincoln" (presumably LinkedIn).  Gonzalez
said she saw "only one or two" Internet pages before she stopped
searching, and she did not see the attorneys' names on those
pages.  The trial court instructed Gonzalez she could not be on
her cell phone during testimony.  When the court inquired
whether she would continue to be on her cell phone if the trial
continues, Gonzalez responded, "Definitely no."  When asked
whether she felt she could still be a fair and impartial juror "after
viewing whatever it is you viewed on your cell phone," Gonzalez
said, "I am.  Yeah."  She added, "It has nothing to do with that.
Whoever.  I believe is telling correctly, whoever has the logic side,
whoever has the appropriate reasoning and has the . . .
justification and explanations, that's all I have to it.  Has nothing
to do, whatever emotional or status or whatever credentials a
person has."

After hearing additional argument from counsel, the court
denied Shangri-La's motion to excuse Gonzalez and for a mistrial.
The court found Gonzalez's untruthfulness was a serious
violation and noted Gonzalez "didn't really ever tell us that she
saw Mr. Turken's picture on there, when we've had one
eyewitness next to her say yes, his picture was on there."
However, the court found "what she did is benign, not excusable,
but not enough to affect her fairness and impartiality to both
sides. . . .  I'm convinced that she can still be fair and impartial

35

despite what she did. And I think an admonition to the entire panel will cure the problem, and it won't happen again."

The court denied Shangri-La's motion for a new trial on the same grounds, holding, "As far as the misconduct of Juror no. 12, the court is still of the view that there was insufficient evidence that such misconduct was prejudicial to [Shangri-La] and that its decision denying [Shangri-La's] motion for mistrial was correct."[15]

   2.   *Shangri-La failed to show Gonzalez's misconduct was prejudicial*

Under Code of Civil Procedure section 657, subdivision (2), grounds for a new trial include misconduct of the jury that "materially affect[s] the substantial rights of [the moving] party." To prevail on a motion for new trial, the moving party has the burden to establish both that an error occurred and "the error was prejudicial—that it affected a substantial right and prevented [the party] from obtaining a fair trial." (*Donlen v. Ford Motor Co.* (2013) 217 Cal.App.4th 138, 147; accord, *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 625.)

"A presumption of prejudice arises from serious juror misconduct." (*Bandana Trading Co., Inc. v. Quality Infusion Care, Inc.* (2008) 164 Cal.App.4th 1440, 1445; accord, *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417, disapproved on another ground in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) However, the presumption "may be rebutted by an

---

[15]   Shangri-La's motion for a new trial was supported by a declaration of counsel attaching excerpts of the certified trial transcript, but neither party presented additional affidavits from the jurors or trial counsel.

affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." (*Hasson*, at p. 417.) "Some of the factors to be considered in this connection are 'the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued." (*Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 557; accord, *Hasson*, at p. 417.) We review de novo whether juror misconduct was prejudicial, supporting a new trial. (*People v. Ault* (2004) 33 Cal.4th 1250, 1262.)

Based on our review of the record, we conclude there was no reasonable probability of prejudice to Shangri-La from Gonzalez's conduct. There was no evidence Gonzalez saw information about Turken's other cases or anything else on his firm's Web site that might have influenced her; nor is there evidence she shared any information with other jurors. (See *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1466 [although juror engaged in misconduct by searching online for the definition of great bodily injury, there was no prejudice requiring a new trial because there was "'no . . . affirmative evidence . . . [the juror] learned anything himself'" and no information was conveyed to the other jurors].) Shangri-La could have presented evidence of what a juror was likely to see on the firm's Web site, but it failed to do so.

Further, although Gonzalez's untruthfulness when confronted was serious, there is no evidence suggesting she lied to preserve her seat on the jury because she had prejudged the case, and the trial court found credible Gonzalez's statement she

37

could remain fair and impartial.  (See *People v. Collins* (2010) 49 Cal.4th 175, 242 [in considering juror misconduct, reviewing court "'accept[s] the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence'"].)

F.     *Silbermann Is Not Entitled to Prejudgment Interest on the Damages for Additional Coring Work*

Under Civil Code section 3287, subdivision (a), a plaintiff is entitled to an award of prejudgment interest where the plaintiff "is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day."  The test for determining certainty is "'"whether defendant actually know[s] the amount owed or from reasonably available information could the defendant have computed that amount."'"  (*Children's Hospital & Medical Center v. Bontà* (2002) 97 Cal.App.4th 740, 774; accord, *Duale v. Mercedes-Benz USA, LLC* (2007) 148 Cal.App.4th 718, 729.)  "'"The statute . . . does not authorize prejudgment interest where the amount of damage, as opposed to the determination of liability, 'depends upon a judicial determination based upon conflicting evidence and it is not ascertainable from truthful data supplied by the claimant to his debtor.'  [Citations.]"  Thus, where the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate.'"  (*Medical Center,* at p. 774; accord, *Duale*, at p. 729.)  "On appeal, [courts] independently determine whether damages were ascertainable for purposes of [prejudgment interest], absent a factual dispute as to what information was known or available to the defendant

38

at the time." (*Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 151 (*Collins*).)

Shangri-La contends Silbermann was not entitled to prejudgment interest because his quantum meruit damages were uncertain until the jury determined the value of his services.[16] We agree as to Silbermann's damages for additional floor coring and overhead and elevator pit coring (parts III and IV of the verdict form). But the retention amounts under the contracts awarded in parts I and II and damages for floor patching work (part V) were reasonably ascertainable.

The trial court awarded prejudgment interest calculated from the date Silbermann filed a mechanic's lien (May 6, 2016). But the mechanic's lien did not provide sufficient information for Shangri-La to use to calculate the amount it owed for the additional work Silbermann performed, only stating generally

---

[16] We reject Shangri-La's contention "[i]t is axiomatic that damages awarded on quantum meruit are not certain until the date of verdict, and thus no interest begins to accrue until such date." Although a claim in quantum meruit may be uncertain, it is not inherently so, particularly if the valuation is based on the parties' agreements. (See, e.g., *Zalk v. General Exploration Co.* (1980) 105 Cal.App.3d 786, 795 ["[T]he trial court concluded that because [plaintiff]'s claim was in quantum meruit, it had no authority to award prejudgment interest. We think this conclusion erroneous, in that the cause of action had a consensual basis and, as discussed earlier, was grounded on the specific agreement of the parties."]; see also *Gray v. Bekins* (1921) 186 Cal. 389, 399 ["True, the action here is one in *quantum meruit*, but even so, if the exact amount of the indebtedness due the plaintiffs was known to and admitted by the defendants, the parties to be charged, the reason for refusing interest until the amount due is made certain by evidence no longer obtains."].)

Shangri-La owed $497,191 for "coring, concrete cutting, concrete patching, [and] labor." The mechanic's lien did not provide any specifics, for example, as to how the amount of the lien was calculated or what contracts and services were included in the amount. Silbermann's June 8, 2016 complaint prayed for the same amount and attached four agreements: the coring contract, the grouting contract, Reyes's January 22, 2016 agreement for Silbermann to perform the floor patching for $129,750, and a December 29, 2015 letter in which Reyes authorized Silbermann to charge $56.25 per hour for additional coring work.

Prejudgment interest on Silbermann's floor patching claim (part V) was proper because the January 22, 2016 letter agreement authorized a total payment of $129,750 for the floor patching project, which was the amount Silbermann sought at trial. The focus of the parties' dispute was Shangri-La's legal obligation to pay Silbermann for floor patching and its contention the work was included within the grouting contract, not the amount of Silbermann's claim. (See *Collins, supra*, 205 Cal.App.4th at p. 151 ["[D]amages are unascertainable if the amount of damages depends on disputed facts or the available factual information is insufficient to determine the amount; and damages are ascertainable if the only impediment to the determination of the amount is a legal dispute concerning liability or the measure of damages."].) Contrary to Shangri-La's contention, the fact the jury awarded Silbermann only $99,750— approximately 77 percent of his claim of $129,750—does not preclude prejudgment interest because the discount applied by the jury does not result from resolution of a factual dispute over the amount of the damages. As the Court of Appeal explained in *Collins*, "[T]he large discrepancy between the amount initially

40

demanded by plaintiffs in this litigation and the amount awarded does not indicate that the damages were unascertainable. The discrepancy results from the resolution of legal disputes regarding the [defendant's] liability and not from the resolution of factual disputes arising from conflicting evidence or the lack of factual information needed to readily calculate damages." (*Collins*, at p. 152; see *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 920 ["A large discrepancy between the amount demanded and the amount awarded indicates that damages were not ascertainable if the discrepancy results from the resolution of factual disputes arising from conflicting evidence or the lack of factual information needed to readily calculate damages."].)[17]

By contrast, there was insufficient information for Shangri-La to evaluate Silbermann's claim for additional floor coring and overhead and elevator pit coring work (parts III and IV). Although Reyes authorized Silbermann to charge $56.25 per hour in the December 29, 2015 letter, Silbermann based his

---

[17] The cases cited by Shangri-La for the contrary proposition involved damage awards that were a small fraction of the plaintiff's claim, and the courts concluded the large disparities were evidence the damages were not reasonably ascertainable. (See *Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 961 [rejecting prejudgment interest where damages were 25 percent of claim]; *Polster, Inc. v. Swing* (1985) 164 Cal.App.3d 427, 436 [recovery of $7,836 on $55,000 demand was "large discrepancy [that] is inconsistent with a sum certain or capable of being made certain"]; *Chesapeake Industries, Inc. v. Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 910 [uncertainty of damages shown by "70 percent shrinkage from the initial claim"].)

41

demand at trial on Reyes's agreement in January 2016 to pay Silbermann $102.50 for each deeper core and $142.50 for each deeper square cut, not the amount approved in the December 29 letter. At trial Silbermann testified he drilled a total of 2,808 cores and 416 cuts that were deeper than 11 inches. But there is no evidence in the record Silbermann advised Shangri-La of the number of deeper cores and cuts he had drilled other than letters he sent on January 27 and February 9, 2016 seeking payment based on 475 holes and 200 cuts deeper than 11 inches that he had drilled by the date of the letters.[18] Further, the jury rejected Silbermann's methodology for valuing the coring work when it awarded him $158,818.75, a sum that corresponded exactly to a written request Silbermann made to Shangri-La's accounting department seeking payment for "extra coring charges" for the period December 2015 through May 9, 2016. There is no evidence when Shangri-La received this request (although it was sometime after May 9, 2016, the date of the last invoice reflected on the request), and Silbermann does not contend this invoice constituted a valuation of his coring work. To the contrary, Silbermann at trial sought nearly twice as much in damages as to parts III and IV of the special verdict form. Under these circumstances, Shangri-La could not have reasonably ascertained Silbermann's damages for additional coring prior to the verdict. (See *Polster, Inc. v. Swing,* (1985) 164 Cal.App.3d 427, 435 [striking prejudgment interest award on lessor's judgment

---

[18] Further, the January 27 and February 9, 2016 letters requested payment based on rates of $100 for each deeper core and $155 for each deeper cut, also at variance with Silbermann's position at trial the agreed rates were $102.50 and $142.50, respectively.

against tenant where lessor's pretrial letters to tenant identifying items of property damage were insufficient for tenant to ascertain money damages and the landlord only recovered 15 percent of its demand at trial]; *Conderback, Inc. v. Standard Oil Co.* (1966) 239 Cal.App.2d 664, 690-691 [construction contractor's damages not reasonably ascertainable by project owner where invoices submitted to property owner were inadequate to determine total amount owed, contractor's own pricing formulas arrived at different amounts, and contractor twice amended its prayer]; cf. *Watson Bowman Acme Corp. v. RGW Construction, Inc.* (2016) 2 Cal.App.5th 279, 296 [parts supplier's contract modification damages ascertainable where the amount awarded by the jury corresponded with supplier's initial price quote, a request for a change order, the complaint, and supplier's counsel's closing argument].)

Finally, as to the trial court's award of prejudgment interest on the contract retention claims (parts I and II), this award was proper because there is substantial evidence Silbermann demanded to be paid the retentions when he finished the work, prior to recording the mechanic's lien, and the amount of the retentions ($37,363) is easily ascertained and undisputed.

Accordingly, we affirm the trial court's award of prejudgment interest on parts I, II and V of the jury's special verdict, and we reverse the award of prejudgment interest on parts III and IV.

## DISPOSITION

We reverse in part the award of prejudgment interest in the judgment and remand to the trial court with instructions to recalculate prejudgment interest consistent with this opinion.  In all other respects, we affirm the judgment.  Silbermann is to recover his costs on appeal.

FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.